United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 18, 2006**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 05-60352
_____

HENRY AUGUSTO TAMARA-GOMEZ,

                                         Petitioner,

versus

ALBERTO R. GONZALES, U. S. ATTORNEY GENERAL,

                                         Respondent.
_____

Petition for Review of an Order of the
Board of Immigration Appeals
_____

Before REAVLEY, JOLLY, and DeMOSS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Henry Tamara-Gomez, a native and citizen of Colombia, brings this petition for review of an order of the Board of Immigration Appeals (BIA) affirming, without opinion, the decision of the Immigration Judge (IJ) denying his application for asylum, withholding of removal, and protection under the Convention Against Torture. In this appeal, arising out of the drug wars of Colombia, we decide that although the petitioner satisfies the requirement of persecution by the insurrectionist terrorists, his claim for asylum and withholding of removal cannot succeed because he has failed to establish a nexus between that persecution and a statutory ground for relief. Further, the petitioner's claim for relief under the Convention Against Torture likewise fails as there has been

insufficient state action as required to demonstrate torture under the Convention. Consequently, we DENY the petition for review.

I

Henry Tamara-Gomez served in the Colombian Air Force, providing mechanical support for helicopters. After leaving the Air Force, Tamara-Gomez was employed as a helicopter mechanic by DynCorp Aerospace as a part of a program of United States assistance to Colombian law enforcement in Bogota, Colombia. As a part of his duties, Tamara-Gomez provided mechanical support for helicopters operated by the Colombian National Police (CNP) in their various law enforcement activities. Tamara-Gomez was occasionally required to ride with the CNP on helicopter missions to perform repairs. Although a civilian, Tamara-Gomez was required to wear a CNP uniform during these trips.

In July 2001, Tamara-Gomez accompanied the CNP on a helicopter mission into a remote village to recover the bodies of five CNP officers killed by the Colombian narco-terrorist guerrilla group Fuerzas Armadas Revolucionarias de Colombia (the Revolutionary Armed Forces of Columbia) known as FARC.[1] After landing in the village Tamara-Gomez noticed three men suspiciously filming the CNP crew with two cameras. Tamara-Gomez alerted the CNP who were able to capture one of the men, a FARC member. The prisoner turned

_____

[1] As corroboration, Tamara-Gomez submitted a report of the Colombian Air Force noting the "guerrilla attack" and detailing the deaths of the five members of the CNP.

2

to Tamara-Gomez and shouted, "We know who you are," and, "You will suffer retaliation." The other men, presumably FARC members, disappeared into the jungle.

Approximately one month after the July 2001 incident Tamara-Gomez began to receive threatening calls, specifically mentioning the jungle mission. These calls were received on Tamara-Gomez's personal cell phone. In time, the actors located Tamara-Gomez, identified his family, and began calling the Tamara-Gomez home threatening both Tamara-Gomez and his family. Fearing for his life and the lives of his family members, Tamara-Gomez sought police protection from the CNP, but was informed that the CNP lacked the resources to provide individual security to families. Tamara-Gomez moved his family to another house. However, within weeks the threats of harm resumed. This time, in addition to threatening calls, Mrs. Tamara-Gomez received demands for money, death threats to her husband, and threats to kidnap her two sons and train them to fight for FARC. The actors identified themselves as FARC members. Tamara-Gomez removed his sons from school and kept them inside his home as much as possible.

In January 2002, a bicycle bomb exploded in the Tamara-Gomez's new neighborhood, killing five (none of the victims were members of Tamara-Gomez's family). After this incident which Tamara-Gomez felt was aimed at his family, Tamara-Gomez sent his wife and children to Miami, Florida on visas obtained prior to the FARC threats. Although he visited his family once in the United States,

3

Tamara-Gomez remained in Colombia to work and lived on a military base for protection.  Although unhappy with the separation, Tamara-Gomez testified that housing on the military base was not available for his entire family.

Although the record is not clear on the exact dates, at some point between the time his family went to the United States in March 2002 and late summer 2002, Tamara-Gomez learned that FARC had tracked down and murdered other participants (or the family members of participants) in the June 2001 CNP body-retrieval mission. Believing his life to be in danger, Tamara-Gomez entered the United States on a visitor's visa on July 24, 2002.  A few weeks after his departure, a vandal broke into the Tamara-Gomez home and spray painted the words "Sapa Regaldo" (which translated means "Two-Bit Snitch") and the letters "FARC."

In addition to evidence of the acts aimed directly at him, Tamara-Gomez introduced nearly 500 pages of official reports detailing the brutality of FARC in Colombia.[2]  Specifically, the reports speak of FARC's brutality, vandalism, and "continued

---

[2] These reports include:  the report of the United Nations Human Rights Counsel entitled "International protection considerations regarding Colombian asylum seekers and refugees"; a report of the U.S. Bureau of Democracy, Human Rights and Labor, entitled "Country Reports on Human Rights Practices: Colombia"; the 2001 and 2002 reports of the U.S. State Department on Colombia; the 2001 and 2002 reports of Amnesty International relating to Colombia; the Human Rights Watch World Report for several years; an official report of the U.S. Senate Foreign Relations Committee entitled "Colombia: Terror from all sides"; and the reports of various other periodicals including The New Yorker magazine and the Dallas Morning News.

practices of killing, attacking, and threatening off-duty police and military personnel, their families, and those who cooperate with them." The State Department reports identify a campaign FARC refers to as "Plan Pistola," which the State Department classifies as a "deliberate strategy" to kidnap, torture, and kill soldiers, police, and their families. The evidence outlines FARC's use of wiretapping, monitoring bank accounts, and surveillance of specific individuals to identify and target persons cooperating with the police or military. Specific instances of violence including the use of gas explosives in cars, bikes, and canisters appear throughout these reports.

In addition to these acts of violence, the evidence in the record continually speaks of FARC's "forcible recruiting" of children as young as twelve years old into their guerilla forces. Once captured or "recruited" these children become essentially the slaves of their commanders, and are subject to extreme physical and sexual abuse. The State Department report for 2002 mentions that in one year alone it was estimated that FARC kidnaped or "forcibly recruited" as many as 120 minors into their ranks. The report goes on to note that many families have reported having to move repeatedly, withdraw their children from school, and/or leave their community in order to flee FARC attempts to take their children. These and other details provided in the reports in the record corroborate the incidents reported by Tamara-Gomez and his family and paint a grim picture of the situation in Colombia.

5

Additionally the reports mention exactly what Tamara-Gomez and his family experienced -- "inadequate government action and resources to combat paramilitary activity and provide security."

Although his visa expired, Tamara-Gomez remained in the United States, and in June 2003 he applied for asylum. On August 1, 2003, Tamara-Gomez was charged with overstaying his visa and ordered to appear. Tamara-Gomez sought relief through the three primary avenues of relief available: 1) asylum under 8 U.S.C. § 1158(b); 2) withholding of removal under 8 U.S.C. § 1231(b)(3); and 3) the United Nations Convention Against Torture,[3] which prevents removal to a country where the alien would face torture. The IJ denied all relief and the BIA affirmed without opinion. We will review each request for relief.

## II

Because the BIA affirmed the IJ without opinion, we treat the IJ's decision as the final agency determination for purposes of review. See Zhang v. Gonzales, 432 F.3d 339, 343 (5th Cir. 2005). Administrative findings of fact are conclusive unless a petitioner can show that "any reasonable adjudicator would be compelled to conclude to the contrary." See 8 U.S.C. § 1252(b)(4)(B). We have held that this standard essentially codifies the substantial

---

[3]The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture), Dec. 10, 1984, 1465 U.N.T.S. 85. See § 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, codified at 28 U.S.C. § 1231 (1998).

evidence standard established by the Supreme Court in <u>INS v. Elias-Zacarias</u>, 502 U.S. 478, 481 (1992). <u>See</u> <u>Zhang</u>, 432 F.3d at 344. As such "[w]e use the substantial evidence standard to review the IJ's factual conclusion that the alien was not eligible for asylum, withholding of removal, and relief under the Convention Against Torture." <u>Id.</u>

A

1

Asylum is discretionary relief,[4] available where 1) a person is "unwilling to return to" their home country "because of persecution or a well-founded fear of persecution"; and 2) the applicant has demonstrated that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." <u>See</u> 8 U.S.C. § 1101(a)(42); and 8 U.S.C. § 1158(b). Although finding Tamara-Gomez credible and "accepting his account" of the facts,[5] the IJ discarded all evidence of persecution.[6] The

---

[4] In support of this discretionary relief, Tamara-Gomez submitted letters and affidavits from various community leaders, including teachers, pastors, and friends. Each confirms that Tamara-Gomez and his family have been model members of the community they have become a part of in the United States.

[5] The IJ's finding that Tamara-Gomez was credible is well supported by the evidence. In addition to documentation generally corroborating the conditions in Colombia, Tamara-Gomez submitted nearly 200 pages of affidavits, sworn statements, newspaper articles, police reports, etc. detailing and confirming the incidents specifically related to the Tamara-Gomez family.

[6] Specifically, the IJ dealt with the evidence as follows:

7

IJ noted that Tamara-Gomez never claimed that he nor "any member of his family were ever beaten, shot at, kidnaped, or otherwise physically harmed"; and "more significantly" that Tamara-Gomez had voluntarily returned to Colombia for "economic reasons" after visiting his family in the United States. Consequently, the IJ noted that Tamara-Gomez was ineligible for asylum as he had failed to demonstrate past persecution, or a well-founded fear of future persecution. Reviewing these findings under the substantial evidence standard, we find that the evidence compels a finding to the contrary.

Tamara-Gomez was recognized and confronted in the jungle by a FARC member who threatened retaliation for Tamara-Gomez's actions. He, and other members of the CNP crew, were photographed by FARC members while assisting in a CNP mission. Within a short amount of time FARC had located Tamara-Gomez and identified his home and cell phone numbers and the names of his wife and children. When Tamara-Gomez relocated, FARC followed. When considered in context, the spray-painted FARC symbols and language on the walls of Tamara-Gomez's new home cannot be dismissed as a "purely criminal act

---

First, the IJ found the "bomb incident" to be "a random act of violence all too common in Colombia and unrelated to the respondent or his wife." Second, the IJ found that the "home invasion . . . may have been a purely criminal act against a target of opportunity." Third, the IJ dismissed the threatening phone calls by finding that "it was far from clear whether they were serious or the acts of persons who enjoy terrorizing their neighbors."

8

against a target of opportunity."[7]  Each act reported by Tamara-Gomez is corroborated by the pages of evidence outlining FARC activity against the police and those associated with them in Colombia.  When we consider the evidence as a whole, which the IJ apparently failed to do, we find that Tamara-Gomez has made a compelling case of persecution.  Based on the documentary evidence, the well-supported testimony of Tamara-Gomez that was specifically found by the IJ to be credible, the threats of violence and acts of vandalism against Tamara-Gomez and his family by persons identified as members of FARC, and the fact that the violent threats against other participants of the same helicopter mission were carried out, a "reasonable adjudicator" would be "compelled" to find that Tamara-Gomez had been persecuted or had a "well founded fear of future harm."[8]  Consequently, the IJ's finding to the contrary was error.[9]

---

[7] Considered in isolation the bike bomb may in fact have been a "random act of violence."  Yet, in the light of the other occurrences it is not unreasonable to believe that the bomb was targeted at Tamara-Gomez and/or his family.  We note the article by the BBC included by Tamara-Gomez in the record discussing the incident as another act of FARC "aimed at those associated with the police."

[8] While the IJ was correct to consider the lack of actual physical violence carried out against the person or family of Tamara-Gomez, physical harm is not always a requirement for asylum. See, e.g., Aguilera-Costa v. I.N.S., 914 F.2d 1375 (9th Cir. 1990) (finding threatening notes to El Salvadorian election worker sufficient to establish a well-founded fear of persecution).

[9] After the hearing in this case, the Attorney General issued the largest drug conspiracy indictment in the history of the United States charging that FARC and its leadership are responsible for

However, our asylum review does not end with a determination of persecution. The alien carries the burden to establish a nexus between the persecution and one of the five statutory grounds for asylum. See 8 U.S.C. § 1158(b) (race, religion, nationality, membership in a particular social group, or political opinion). It is on this point that Tamara-Gomez's request for asylum fails.[10]

Tamara-Gomez argues that his association with the CNP has caused FARC to attribute to him the political opinions and beliefs of the Colombian government, or at the least to view him as a political opponent. This claim is not supportable. As the IJ correctly found, FARC targeted Tamara-Gomez because they viewed him as a part of the CNP -- not as a result of any specific or personal belief imputed to him in that role. It is clearly established that "[d]angers faced by policemen as a result of that status alone are not ones faced on account of race, religion, nationality, membership in a particular social group or political opinion."

---

smuggling approximately $25 billion in cocaine into the United States and other countries. The indictment notes that FARC is known for its brutality against the citizens and government officials of Colombia, including brutal acts of violence such as murder, rape, and dismemberment while the victim is alive. See, e.g., Juan Forero, U.S. Indicts 50 Leaders of Colombian Rebels in Cocaine Trafficking, N.Y. Times, March 23, 2006, at A7.

[10] The IJ noted this deficiency, finding that even had the persecution requirement been met by Tamara-Gomez, "it remains to be seen whether such a fear would have a nexus to one of the five protected grounds."

Matter of Fuentes, I & N Dec. 658, 661 (BIA 1988).  As the BIA has stated:

> Policemen are by their very nature public servants who embody the authority of the state.  As policemen around the world have found, they are often attacked either because they are (or are viewed as) extensions of the government's military forces or simply because they are highly visible embodiments of the power of the state.  In such circumstances, the dangers the police face are no more related to their personal characteristics or political beliefs than are the dangers faced by military combatants.  Such dangers are the perils arising from the nature of their employment and domestic unrest rather than "on account of" immutable characteristics or beliefs within the scope of [8 U.S.C. § 1158(b)].

Id.  Consequently, we conclude that the required nexus between the persecution and a statutory ground for asylum has not been established.  Thus, the denial of asylum is supported by substantial evidence.

The IJ denied Tamara-Gomez's requests for withholding of removal and relief under the Convention Against Torture on the grounds that such relief requires a showing of persecution equal to or greater than that required by 8 U.S.C. § 1158 for asylum.  Because the IJ's finding as to persecution was error, we turn to consider these alternative measures of relief.

B

Relief under 8 U.S.C. § 1231(b)(3) is discretionary, and prohibits the removal of an alien to a country where that alien's life or freedom would be threatened.  See 8 U.S.C. § 1231(b)(3)

11

(providing for relief by withholding removal). As outlined in the discussion above, Tamara-Gomez may have established the fear of future harm required for this relief. However, § 1231(b)(3) relief, like asylum, requires the alien to establish that the danger to life or freedom results from "the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Thus, as with asylum, substantial evidence supports the IJ's denial of Tamara-Gomez's request for withholding of removal, as association with the police does not fall into one of the statutory grounds for withholding removal.

C

Tamara-Gomez also seeks relief under the provisions of the Convention Against Torture. Article III of the Convention provides, "[n]o State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture, Art. III. Significantly, relief under the Convention Against Torture does not require a nexus to specific statutory grounds. See e.g., Camara v. Ashcroft, 378 F.3d 361 (4th Cir. 2004) (holding that an alien need not prove the reason for the torture to be eligible for Convention Against Torture relief). Nor is the inability to establish asylum fatal to the pursuit of Convention Against Torture relief. See, e.g., Ramsameachire v. Ashcroft, 357 F.3d 169 (2d Cir. 2004) (finding the

12

Convention Against Torture inquiry to be independent of asylum analysis); <u>Farah v. Ashcroft</u> 348 F.3d 361 (9th Cir. 2003) (holding that the failure to establish eligibility for asylum does not necessarily doom an application for Convention Against Torture relief).

To obtain relief under the Convention Against Torture, the alien need not demonstrate all of the elements of a persecution claim; instead he must show a likelihood of torture upon return to his homeland.  <u>See</u>, <u>e.g.</u>, <u>Camara v. Ashcroft</u>, 378 F.3d 361 (4th Cir. 2004); <u>Lukwago v. Ashcroft</u>, 329 F.3d 157 (3d Cir. 2003); <u>Malhi v. I.N.S.</u>, 336 F.3d 989 (9th Cir. 2003); <u>Efe v. Ashcroft</u>, 341 F.3d 348 (5th Cir. 2003) (all requiring the alien to establish that it is "more likely than not" that he will be tortured if removed to his native country).  "Torture is defined as any act by which severe pain or suffering . . . is intentionally inflicted on a person . . . for any reason . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  8 C.F.R. § 208.18(a)(1).  Thus relief under the Convention Against Torture requires a two part analysis -- first, is it more likely than not that the alien will be tortured upon return to his homeland;[11] and second, is there sufficient state

_____

[11] In considering whether the alien has met his burden of proof, the IJ should consider, along with other evidence:

(i) Evidence of past torture inflicted

13

action involved in that torture.  Even if Tamara-Gomez could show that there is a likelihood of torture upon his return to Colombia, his claim for relief must fail because the state action requirement has not been met.

The Convention Against Torture requires "a public official" or "person acting in a public capacity" to "inflict," "acquiesce," or "give consent" to the torture.  Tamara-Gomez cannot make this showing.  The Government of Colombia has not in any way inflicted, acquiesced, or even turned a blind eye to the conduct of FARC.  By Tamara-Gomez's own testimony, the Colombian government allowed him to live at a military base under the protection of the Colombian government.  The Colombian government apparently is fully engaged in opposition to FARC.  We agree with other circuits that neither the failure to apprehend the persons threatening the alien, nor the lack of financial resources to eradicate the threat or risk of torture constitute sufficient state action for purposes of the Convention Against Torture.  See, e.g., Reyes-Sanchez v. United States, 369 F.3d 1239 (11th Cir. 2004) (holding that the failure of

---

upon the applicant;
    (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
    (iii) Evidence of gross, flagrant or mass violations of human rights within the country or removal, where applicable; and
    (iv) Other relevant information regarding conditions in the country of removal.

Zhang, 432 F.3d at 345 n.4 (citing 8 C.F.R. § 208.16(c)(3)).

the Peruvian government to apprehend the rebels responsible for holding an alien at gunpoint did not constitute acquiescence by the Peruvian government to the rebel activity); Auguste v. Ridge, 395 F.3d 123 (3d Cir. 2005) (holding that where prison conditions resulted from budgetary and management problems rather than an intent to inflict physical or mental pain and suffering, the fact that Haitian authorities had knowledge of suffering resulting from horrible prison conditions did not constitute intent by the Haitian government that such suffering take place).  It is an unfortunate circumstance that the CNP is unable to provide complete security to Tamara-Gomez and his family.  Nevertheless, the lack of such security does not rise to the level of state action required for relief under the Convention Against Torture.  Further, the willingness of the Colombian military to allow Tamara-Gomez to live on base further belies an inference of acquiescence on the part of the Colombian government.  Consequently, substantial evidence supports the IJ's denial of Tamara-Gomez's claim for relief under the Convention Against Torture.

                                IV

    This case evokes feelings of sympathy for those fighting the drug lords and insurrectionists in Colombia.  We have been made aware of the dangers that many face in the drug wars and related violence occurring in Colombia.  As the IJ noted "the respondent and his family are well-educated and most appealing and the court can easily understand that they would prefer to be in the

                                15

relatively stable environment we enjoy here in the United States rather than in a country where violence is a part of everyday life." Yet a review of the evidence and applicable law compels us to conclude that Tamara-Gomez has not demonstrated the necessary nexus between persecution and a statutory ground required for asylum or withholding of removal. Further, Tamara-Gomez has not proven state action sufficient to make him eligible for relief under the Convention Against Torture. Accordingly, the petition for review is

DENIED.

16