# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 8, 2023

Lyle W. Cayce
Clerk

———————

No. 22-60340

———————

Eufemia Martinez-De Umana; Imelda Tatiana Umana-Martinez; Katherine Lisbeth Umana-Martinez,

*Petitioners*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

———————————————————

Appeal from the Board of Immigration Appeals
Agency Nos. A202 072 741,
A202 072 761, A212 998 321

———————————————————

Before Jones, Stewart, and Duncan, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Petitioner seeks review of an order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") decision that she and her two daughters are ineligible for immigration relief on any ground. Because we conclude that substantial evidence supports the BIA's order denying relief to Petitioner, we DENY the petition for review.

No. 22-60340

## I. FACTUAL & PROCEDURAL BACKGROUND

In 2014, Petitioner Eufemia Martinez-De Umana, a native and citizen of El Salvador, attempted to enter the United States near Hidalgo, Texas, with her daughter Katherine. An asylum officer interviewed Martinez-De Umana and determined that she had a credible fear of persecution based on her membership in a particular social group. The Department of Homeland Security ("DHS") then personally served Martinez-De Umana and Katherine each with a Notice to Appear ("NTA"), charging them with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I), as aliens who sought admission without a valid entry document. In October 2014, Martinez-De Umana appeared with counsel before an IJ, admitted the factual allegations in the NTAs, and conceded that she and Katherine were removable as charged. She sought relief in the form of asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Several years later in 2017, another one of Martinez-De Umana's daughters, Imelda, attempted to enter the United States without authorization. DHS served her with an NTA charging her with removability under 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled. Her removal proceedings were later consolidated with Martinez-de Umana's and Katherine's proceedings.

In December 2018, Martinez-De Umana appeared before the IJ again and set forth her claims for immigration relief.[1] She asserted that her claim for asylum and withholding of removal was based on her membership in several particular social groups, which she defined as: (1) employees of the Ministry of Justice, (2) former employees of the Ministry of Justice, (3)

---

[1] Martinez-De Umana is the lead petitioner in the underlying proceedings and on appeal, advancing claims for immigration relief on behalf of herself and her two daughters.

immediate family members, and (4) whistleblowers. She testified that, from 2012 to 2014, she worked at the Ministry of Justice, an organization that oversaw the prison system in El Salvador. She testified that she initially worked as a security officer inside the prison and received "military training." Later, she began working in the prison's administrative office. She testified that her job duties included monitoring the security cameras across "all the prisons of the country," looking for instances of contraband, escape attempts, and fights among inmates. She further testified that she was required to wear a uniform and a ski mask covering her face to protect her identity from the prisoners, who viewed the prison staff as "enemies."

She further testified that her neighbor, who was affiliated with the MS-13 gang, saw her when she was on her lunch break in downtown San Salvador. She testified that she was wearing her uniform at the time, which included a badge identifying her as an employee of the Ministry of Justice. She claims that when her neighbor saw her, he said "[n]ow I know that you work at the Ministry of Justice." Thereafter, another neighbor, who was also a gang member, asked her how her work was going, indicating that he also knew where she worked. She further claimed that various gang members would follow her, watch her house, and on one occasion a gang member told her to open the door because he wanted to speak with her. She testified that she believed he may have been trying to collect a "gang tax" so she told him she did not want to speak with him. She decided to take a two-month leave of absence from her job in April 2014, explaining that she thought the gangs would leave her alone if they believed that she no longer worked for the Ministry of Justice. She claims that after doing so, however, she still saw gang members "passing by, looking at [her] house." Additionally, her garbage man, who was friendly with the gang, told her that the gangs were planning to visit her.

In May 2014, two of Martinez-De Umana's coworkers who worked as guards in the prison system were killed when gang members attacked a bus in which they were riding. Martinez-De Umana testified that she and her daughter Katherine left for the United States a few days later. According to Martinez-De Umana, after she left El Salvador, the gangs began attacking her husband. The first attack occurred in June of 2014, when gang members took her husband from their home to a field where they beat him and asked about her whereabouts. She explained that the orders for the attack came from inside the Barrios City jail, which is where members of the MS-13 gang are housed. Her husband told the gang members that he had separated from Martinez-De Umana, expecting that they would leave him alone.

In July 2014, her husband was attacked again while working as a microbus driver. Martinez-De Umana asserts that during this attack, gang members boarded her husband's bus and took documents and money from him. They also robbed some of the passengers and told her husband that they were waiting for information about her whereabouts. She testified that her husband was attacked a third time in August of 2014. She claimed that gang members pulled him out of his car and shot out his car windows, threatening that, "[n]ext time it's going to be you, if you don't tell us the whereabouts of your wife." She further stated that her husband was attacked a fourth time in January of 2015, when gang members attempted to stop the microbus he was driving. Although her husband continued driving, the gang members waited and shot him in his left arm as he passed by on his return route. After the fourth attack, she claims her husband briefly went into hiding. Though now, he lives in their home in the same neighborhood with a new partner and children and there have been no other attacks since 2015. Martinez-De Umana testified that the attacks likely stopped because the gang members saw him with his new family and assumed that he was no longer associated with her.

Dr. Thomas Boerman also testified on Martinez-De Umana's behalf as an expert on gangs and organized criminal groups in El Salvador. He testified that the government of El Salvador is involved in a violent power struggle with the MS-13 gang and that targeting government employees is central to the gang's "strategy of terror." He explained that former government employees are "in a very unique and vulnerable position" because the government in El Salvador has no "protective mechanism" for former police, military, or corrections officers, yet they are known to gang members, who will continue to pursue them because they are likely to "continue to embody . . . pro rule of law values."

Dr. Boerman further testified that gang members in El Salvador often "terrorize and leverage corrections officials" in order to gain intelligence and obtain weapons and ammunition. He testified that the gangs also use corrections officers to support their illegal activities in other ways such as smuggling contraband into the prisons and communicating messages from inside the prison to gang members in the community. He further opined that the gangs sought to "assert control over [Martinez-De Umana] through the use of terror towards herself and her family so that they could then use her as an asset within the prison system."

The IJ issued an oral decision denying Martinez-De Umana's claims for asylum, withholding of removal, and CAT protection and ordered her and her daughters removed to El Salvador. Citing *Matter of Fuentes*, 19 I. & N. Dec. 658, 661 (BIA 1988), the IJ concluded that Martinez-De Umana's proposed social group of "employees of the Ministry of Justice" lacked the requisite nexus to a protected statutory ground "given the inherent assumption of risk that is tied to a law enforcement job." Likewise, the IJ determined that her second proposed social group of "former employees of the Ministry of Justice" also lacked nexus. The IJ further averred that there was no nexus between the harm she claimed to have suffered and feared in El

No. 22-60340

Salvador and her proposed social groups of her immediate family members and whistleblowers.

Although the IJ acknowledged the expert testimony and country conditions evidence supporting the existence of an "ongoing power struggle between the gangs and the government," it was not persuaded that Martinez-De Umana could not relocate and live safely in another part of El Salvador. Consequently, the IJ concluded that she had failed to establish a well-founded fear of future persecution because she had not shown that it would be unreasonable for her to relocate to another part of El Salvador to avoid harm.

Because Martinez-De Umana had failed to show a well-founded fear of future persecution or the requisite nexus to a protected ground, the IJ determined that she was not eligible for asylum. It further reasoned that because she had failed to meet her burden of proof with respect to her asylum claim, she had necessarily failed to meet the higher burden of proof for establishing withholding of removal. Finally, the IJ explained that she was not entitled to CAT protection because she had failed to show that it was more likely than not that she would be tortured if removed to El Salvador.

Martinez-De Umana appealed the IJ's decision to the BIA. Relevant to her appeal before this court, she argued that the IJ erroneously applied *Matter of Fuentes* as a per se bar to relief without evaluating her "specific risk profile." She emphasized that she was an "ordinary government employee" and, unlike the respondent in *Matter of Fuentes*, she did not serve as a police officer or in any other type of employment with an inherent assumption of risk.

On May 17, 2022, the BIA issued a decision dismissing Martinez-De Umana's appeal. The BIA was not persuaded by her argument that her case was distinguishable from *Matter of Fuentes* because she was an "ordinary government employee" who worked in an office. To the contrary, the BIA

No. 22-60340

emphasized that: (1) she worked in the prison system monitoring prisoners via video surveillance equipment; (2) she wore civilian clothing when commuting to work so that she would not be identified as a prison employee; and (3) she also wore a mask while at work to conceal her identity from prisoners and visitors to the prison. Based on these facts, the BIA reasoned that she was more than an "ordinary government employee" and that she was threatened in the normal course of her employment in law enforcement. Thus, there was no clear error in the IJ's application of *Matter of Fuentes* and its conclusion that there was no nexus.

The BIA also rejected Martinez-De Umana's argument that the IJ erred in concluding that she did not have a well-founded fear of future persecution, despite Dr. Boerman's testimony to the contrary. The BIA noted that the IJ has broad discretion regarding how much weight to give expert testimony, and the IJ's conclusions were supported by the record.

Because Martinez-De Umana failed to show the requisite nexus to a protected ground, the BIA determined that she was not eligible for asylum and withholding of removal.[2] The BIA declined to consider her remaining arguments related to her eligibility for these forms of relief because the nexus issue was dispositive. One BIA member dissented, explaining that she would have remanded for the IJ to separately analyze the elements of Martinez-De Umana's asylum claim. Martinez-De Umana timely petitioned this court for review of the BIA's order. *See* 8 U.S.C. § 1252(b)(1).

---

[2] Because Martinez-De Umana did not challenge the IJ's denial of CAT relief, the BIA deemed the issue waived. *See Matter of P-B-B-*, 28 I. & N. Dec. 43, 44 n.1 (BIA 2020). For this reason, the issue is not before this court on appeal. *See Cardona-Franco v. Garland*, 35 F.4th 359, 363 (5th Cir. 2022) (noting that this court lacks jurisdiction to consider arguments not first raised before the BIA due to 8 U.S.C. § 1252(d)(1)'s exhaustion requirement).

## II. STANDARD OF REVIEW

This court reviews the BIA's decision and considers the IJ's decision only to the extent it influenced the BIA. *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012). The BIA's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. *Id.* at 517–18. The substantial evidence test "requires only that the BIA's decision be supported by record evidence and be substantially reasonable." *Omagah v. Ashcroft*, 288 F.3d 254, 258 (5th Cir. 2002). This court will not reverse the BIA's factual findings unless the evidence compels a contrary conclusion. *Orellana-Monson*, 685 F.3d at 518.

## III. DISCUSSION

On appeal, Martinez-De Umana advances two primary arguments. First, she argues that the BIA erred in concluding that she was ineligible for immigration relief based on *Matter of Fuentes*. She maintains that the BIA's application of *Matter of Fuentes* was too broad, rendering any government employee, even an office worker, ineligible for relief. Second, she argues that the BIA erred in affirming the IJ's decision that she had failed to show a well-founded fear of future persecution if she returned to El Salvador. She contends that the IJ disregarded substantial uncontroverted evidence,

No. 22-60340

including expert testimony, that supported her well-founded fear of future persecution in El Salvador.[3] We address each of her arguments in turn.

### A. BIA's Application of Matter of Fuentes

Asylum may be granted to a noncitizen who is unable or unwilling to return to her home country because of past persecution or a well-founded fear of persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." *Orellana-Monson*, 685 F.3d at 518 (quoting *Tamara-Gomez*, 447 F.3d 343, 348 (5th Cir. 2016)). The applicant must establish that a statutorily protected ground was or will be at least one of the central reasons behind her persecution. *Id.* The ground does not have to be the only reason for harm, but it cannot be "incidental, tangential, superficial, or subordinate to another reason for harm." *Shaikh v. Holder*, 588 F.3d 861, 864 (5th Cir. 2009) (quoting *Matter of J-B-N & S-M-*, 24 I. & N. Dec. 208, 212 (BIA 2007)). To be entitled to withholding of removal, the applicant must demonstrate a clear probability of persecution if

---

[3] Martinez-De Umana also raises arguments in her brief regarding whether: (1) the threats she experienced rose to the level of past persecution; (2) her fear of future persecution is objectively reasonable, and thus well-founded; and (3) it would be reasonable for her to relocate within El Salvador to avoid persecution. As the Government observes, however, the BIA did not address these matters because it determined that Martinez-De Umana was ineligible for asylum and withholding of removal based solely on nexus grounds. Consequently, these issues exceed the scope of our review on appeal, and we will not address them herein. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

Moreover, she no longer claims eligibility for asylum and withholding of removal based on her membership in her proposed social group consisting of "current" employees of the Ministry of Justice. Nor does she challenge the BIA's conclusion that she failed to show the requisite nexus between the alleged harm she feared and suffered and her proposed social groups of immediate family members and whistleblowers. Accordingly, she has abandoned these issues by failing to raise them in her opening brief. *See Soadjede v. Ashcroft*, 324 F.3d 830, 833 (5th Cir. 2003) (stating that issues not briefed are abandoned).

returned to his home country on account of the same statutory grounds that apply to asylum claims. *Majd v. Gonzales*, 446 F.3d 590, 595 (5th Cir. 2006). Because withholding of removal has a higher standard than asylum, "failure to establish eligibility for asylum is dispositive of claims for withholding of removal." *Id*.

In *Matter of Fuentes*, the BIA considered the asylum claim of a former member of the national police of El Salvador. 19 I. & N. Dec. at 659. The applicant testified that he was attacked by guerrilla insurgents while securing the highways in El Salvador and standing guard at the United States embassy. *Id*. He further testified that the guerillas in his hometown knew him by name and threatened him personally while he was a member of the national police. *Id*. In rejecting the applicant's asylum claim, the BIA reasoned that policemen "are often attacked either because they are (or are viewed as) extensions of the government's military forces or simply because they are highly visible embodiments of the power of the state." *Id*. at 661. The BIA compared the role of an armed policeman to "the dangers faced by military combatants" and concluded that the applicant had effectively assumed the risk of exposure to violence. *Id*. It explained that such dangers are "perils arising from the nature of their employment and domestic unrest" and were not on account of any protected ground. *Id*. It concluded that "dangers faced by policemen as a result of that status alone are not ones faced on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. at 661.

In *Tamara-Gomez*, 447 F.3d at 349, this court applied the BIA's decision and reasoning as set forth in *Matter of Fuentes*. The asylum applicant in *Tamara-Gomez* provided mechanical support for helicopters operated by the Colombian National Police ("CNP") and was at times required to accompany the CNP on helicopter missions to perform necessary repairs. *Id*. at 345. Although a civilian, the applicant was required to wear a CNP uniform

during these missions. *Id.* While accompanying the CNP on a mission to recover the bodies of several officers that had been killed by a Colombian guerrilla group, the applicant was spotted by the guerilla members. *Id.* at 345–46. After the mission, the applicant received numerous threatening phone calls, a bomb exploded near his home, and others who had participated in the mission were murdered. *Id.* at 346. Though a panel of this court determined that the applicant had "made a compelling case of persecution," it nonetheless held that he was ineligible for asylum relief because he had failed to show the requisite nexus between his alleged persecution and one of the five statutory grounds for asylum. *Id.* at 348–50. The panel then expressed agreement with the IJ's conclusion that the guerrilla group "targeted [the applicant] because they viewed him as a part of the CNP—not as a result of any specific or personal belief imputed to him in that role." *Id.* at 349. Referencing *Matter of Fuentes*, the panel then reiterated that the dangers policemen face due to their status as officers "are not ones faced on account of race, religion, nationality, membership in a particular social group or political opinion." *Id.* (quoting 19 I. & N. Dec. at 661).

In this case, Martinez-De Umana argues that the BIA's interpretation of *Matter of Fuentes* imposes a per se rule rendering any government employee ineligible for relief, without regard to whether they are "highly visible embodiments" of state power. She further contends that *Matter of Fuentes* was intended to address the limited situation of persecution arising from police duties and military operations and does not apply to office workers like herself. We are unpersuaded by her arguments.

According to Martinez-De Umana, she has provided evidence that she is eligible for asylum and withholding of removal based on two grounds—her fear of persecution based on (1) her membership in a proposed social group of former employees of the Ministry of Justice and (2) and the anti-gang political opinion imputed to her by the MS-13 gang as a former

government employee. As for her argument that she has a fear of persecution on account of her status as a former employee of the Ministry of Justice, she misses the mark. Although she emphasizes the fact that she was an office worker and therefore not a "highly visible embodiment" of the state, her argument misconstrues the BIA's analysis in *Matter of Fuentes*. There, as mentioned, the BIA stated that "[a]s policemen around the world have found, they are often attacked either because they are (or are viewed as) extensions of the government's military forces or simply because they are highly visible embodiments of the power of the state." *Matter of Fuentes*, 19 I. & N. Dec. at 661. Although Martinez-De Umana claims that she was just an "office worker," as the IJ and the BIA observed, she worked "under the general administration of the penal system" where "her duties included monitoring prisoners and visitors via video surveillance equipment." The record also reflects that she received military training involving the use of weapons when she began working as a security officer inside the prison before her job duties changed to conducting surveillance. Then, when she began working in surveillance, her duties required her to monitor the prison for instances of contraband, escape attempts, and fights among inmates. She further testified that she was required to wear a uniform and a ski mask covering her face to protect her identity from the prisoners, who viewed the prison staff as "enemies." Additionally, though she frequently dressed in civilian clothes when travelling to and from work to hide her identity, the record reveals that a gang member spotted her in uniform on her lunchbreak in downtown San Salvador and thereafter presumably revealed to other gang members that she worked for the Ministry of Justice. This was no regular office job.

In sum, we disagree with Martinez-De Umana's characterization that she was just an "ordinary government employee" who worked in an office and therefore should be exempted from the application of *Matter of Fuentes*.

No. 22-60340

Although she may have routinely attempted to conceal her identity, her employment for the Ministry of Justice was nonetheless discovered by the gangs when she wore her uniform outside of the prison. Thereafter, her employment with the Ministry of Justice was well known, which presumably led the gangs to view her as a "visible embodiment of the state" as well as an "extension[] of the government's military forces." As the BIA stated in *Matter of Fuentes*, "the dangers the police face are no more related to their personal characteristics or political beliefs than are the dangers faced by military combatants. Such dangers are perils arising from the nature of their employment and domestic unrest rather than 'on account of' immutable characteristics or beliefs within the scope of [the statute]." *Id.* And as we echoed the BIA's position in *Tamara-Gomez*, the "[d]angers faced by policemen as a result of that status alone are not ones faced on account of race, religion, nationality, membership in a particular social group or political opinion." 447 F.3d at 349 (quoting *Matter of Fuentes*, 19 I. & N. Dec. at 661).[4] Accordingly, we agree with the BIA that Martinez-De Umana was more than an "ordinary government employee" and that she had been threatened in the "normal course of her employment in law enforcement," and not on account of a protected statutory ground.

We also reject Martinez-De Umana's argument that she fears persecution on account of the anti-gang political opinion imputed to her by

---

[4] The same reasoning undermines Martinez-De Umana's argument that she faced persecution on account of her former employment with the Ministry of Justice because such status is an "immutable characteristic." *See Matter of Fuentes*, 19 I. & N. Dec. at 662 (holding that although the applicant's status as a former member of the national police was an "immutable characteristic," he had nevertheless failed to "adequately demonstrate[] a well-founded fear of 'persecution' on account of his status as a former policeman" because the record indicated that he had been subjected to "danger[s] that one with ties to a participant in a violent struggle might expect if he ventures into an area of open conflict").

the MS-13 gang as a former government employee. As an initial matter, this court has already rejected an applicant's argument that she can establish a well-founded fear of persecution based on her political opinion defined as "pro rule-of-law, anti-corruption, and anti-gang." *See Cabrera v. Sessions*, 890 F.3d 153, 161 (5th Cir. 2018); *see also Orellana-Monson*, 685 F.3d at 521–22 (holding that "Salvadoran males, between the ages of 8 and 15," recruited by gangs but who refused to join, did not constitute a particular social group).

Moreover, the record reflects that the primary reason the gang members targeted Martinez-De Umana was to exploit her work-related access and knowledge from her employment with the Ministry of Justice in order to further their criminal enterprise. The evidence further indicates that Martinez-De Umana's statements to the asylum officer during her credible fear interview reflected her recognition that prison employees like herself were being targeted by the gangs to "put pressure on the government" in El Salvador and to obtain special privileges for gang members who were imprisoned. She also stated that she believed that she would be targeted by gangs if she returned to the country because she had information about the prison security system, including the location of the cameras used to monitor inmates. But as this court has held, "[c]onduct that is driven by criminal . . . motives does not constitute persecution" on account of a protected ground. *See Vasquez-De Lopez v. Lynch*, 620 F. App'x 293, 295 (5th Cir. 2015) (citing *Thuri v. Ashcroft*, 380 F.3d 788, 792–93 (5th Cir. 2004)); *see also Garcia v. Holder*, 756 F.3d 885, 890 (5th Cir. 2014) (explaining that "[t]his court does not recognize economic extortion" as persecution based on a protected ground).

For these reasons, we hold that substantial evidence supports the BIA's conclusion that Martinez-De Umana is ineligible for immigration relief in the form of asylum because has failed to show the requisite nexus between the harm she claims she suffered and feared in El Salvador and a protected

statutory ground. *See Orellana-Monson*, 685 F.3d at 517.[5] Furthermore, because she has failed to establish that she is eligible for asylum, she necessarily fails to meet the higher burden required to establish eligibility for withholding of removal. *See Vazquez-Guerra v. Garland*, 7 F.4th 265, 271 (5th Cir. 2021) ("The standard for obtaining withholding of removal is even higher than the standard for asylum, requiring a showing that it is more likely than not that the alien's life or freedom would be threatened by persecution on one of the protected grounds. . . . Accordingly, the failure to establish a well-founded fear for asylum eligibility also forecloses eligibility for withholding of removal." (internal quotation marks and citations omitted)).

### B. Future Persecution

Martinez-De Umana next argues that the BIA erred in affirming the IJ's conclusion that she had failed to show a well-founded fear of future persecution if she returned to El Salvador. She maintains that the IJ disregarded extensive evidence supporting her well-founded fear of persecution, including the expert testimony of Dr. Boerman and other documentary evidence. We disagree.

Where the IJ finds an expert witness to be credible, "it does not follow that the [IJ] must accept all the testimony and opinions provided as facts." *Matter of M-A-M-Z-*, 28 I. & N. Dec. 173, 177 (BIA 2020). Our review of the

---

[5] Because we conclude that substantial evidence supports the BIA's determination that Martinez-De Umana is ineligible for asylum relief because she has failed to show the requisite nexus between her alleged persecution and a protected ground, we need not address her argument pertaining to the BIA's dissenting board member's position that she would have remanded for the IJ to separately analyze the elements of Martinez-De Umana's asylum claim. *See Matter of J-G-*, 26 I. & N. Dec. 161, 170 (BIA 2013) (declining to address the respondent's remaining contentions after deciding the dispositive issue in the appeal) (citing *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.")).

record indicates that the IJ carefully considered all of the evidence presented, including Dr. Boerman's testimony. Indeed, the IJ summarized Dr. Boerman's testimony, including his opinion that Martinez-De Umana was at "high risk" of being persecuted in El Salvador because gangs perceive former employees of the government as having "a pro-government view." The IJ also cited Dr. Boerman's written declaration, noting that it had "been entered into the record." Because the record confirms that the IJ expressly considered Dr. Boerman's expert testimony, we reject Martinez-De Umana's argument that it erroneously substituted "conjecture" or "unsupported speculation" for evidence in making factual findings.

Accordingly, we hold that the BIA did not err in rejecting Martinez-De Umana's argument on this issue given its reasoning that the IJ considered "the entirety of the evidence of record," which included Dr. Boerman's testimony. *See Orellana-Monson*, 685 F.3d at 517; *see also Matter of M-A-M-Z-*, 28 I. & N. Dec. at 177 ("Expert witness testimony is evidence, but only an [IJ] makes factual findings. The question of what probative value or weight to give to expert evidence is a determination for the [IJ] to make as the fact finder.").

## IV. Conclusion

For the foregoing reasons, the petition for review is DENIED.