# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
December 5, 2023

Lyle W. Cayce
Clerk

————————

No. 22-60307

————————

Samuel De Jesus Argueta-Hernandez,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

————————————————————————

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. A094 753 033

————————————————————————

## ON PETITIONS FOR REHEARING AND REHEARING EN BANC

Before Higginbotham, Graves, and Douglas, *Circuit Judges*.
Dana M. Douglas, *Circuit Judge*:

As neither a member of this panel, nor judge in active service, requested that the court be polled on rehearing en banc, the petitions for rehearing en banc are DENIED. Fed. R. App. P. 35 and 5th Cir. R. 35. The petition for panel rehearing is GRANTED. We withdraw our previous opinion and substitute the following:

No. 22-60307

Samuel de Jesus Argueta-Hernandez seeks review of the Board of Immigration Appeals' ("BIA") denial of his application for withholding of removal and protection under the Convention Against Torture ("CAT"). While living in El Salvador, a leader of the infamous gang, MS-13, and other gang members targeted and threatened Argueta-Hernandez and his family. Despite finding him credible, and despite police reports and evidence corroborating the gang's threats and attempt to kill Argueta-Hernandez's son, the Immigration Judge ("IJ") denied his claims and ordered him removed from the United States.

Although we owe deference to the BIA, that deference is not blind. Here, where the BIA misapplied prevailing case law, disregarded crucial evidence, and failed to adequately support its decisions, we are compelled to grant the petition for review, vacate the immigration court decisions, and remand to BIA for further proceedings.

## I. Background

Argueta-Hernandez is a native and citizen of El Salvador who first entered the United States without inspection. An IJ ordered his removal to El Salvador on March 30, 2007. Argueta-Hernandez reentered the United States in 2019 and the Department of Homeland Security ("DHS") reinstated his 2007 removal order on September 19, 2019.

Following his removal, an asylum officer conducted a reasonable fear interview of Argueta-Hernandez in June 2021. During his interview, Argueta-Hernandez stated that members of the violent and formidable MS-13 gang repeatedly threatened the lives of him and his family, that MS-13 stalked and surveilled them, that MS-13 caused his son to crash his motorcycle when its known assassin followed him, and that four Salvadoran

government agencies[1] said his life is in danger, but they cannot protect him. The gang threats began in 2018 after Argueta-Hernandez refused to pay rent to, or collaborate with them because "he did not want to be complicit with their 'evil doings.'" Argueta-Hernandez testified that he was the President of Evangelism at his Christian church and, as time went on, the Salvadoran anti-gang unit officials explained that MS-13 is targeting him "because he is a Christian." He also testified that Salvadoran officials detained him for three weeks in an anti-gang unit safe house. Furthermore, he could not safely relocate in El Salvador "because [MS-13] operates communication networks in all neighborhoods and throughout the region." DHS initiated withholding-of-removal proceedings because an asylum officer found that Argueta-Hernandez was credible and had a reasonable fear of torture in El Salvador.

Subsequently, the IJ determined that Argueta-Hernandez was credible, and witnesses corroborated his testimony. The IJ found that Argueta-Hernandez's reports of death threats against him and his family, claims that MS-13 targeted him based on his religion, and allegations that MS-13 attempted to kill his son were supported by credible testimony, police reports, and other evidence. Importantly, Argueta-Hernandez supplemented the testimonial evidence with United States Department of State country conditions reports from the relevant years detailing gang threats to religious individuals, and expert analysis placing "the risk of torture or death as extremely likely" for Argueta-Hernandez. Nonetheless, the IJ concluded that Argueta-Hernandez failed to show that he had suffered past persecution or had a well-founded fear of future persecution. The IJ

---

[1] As the IJ found, Argueta-Hernandez sought help from four separate government offices: the National Civil Police, the Anti-Gang Unit, the Human Right's Office, and the Prosecutor's Office.

explained that "[m]ere verbal threats are generally insufficient to constitute persecution." Furthermore, the IJ ruled that the harm was not because of Argueta-Hernandez's religion, as MS-13 allegedly "never stated that they were threatening [him] solely because of his involvement with the Church of God." Instead, the IJ concluded that he was targeted because of "his reputation as a good person . . . in the community."

With respect to his CAT claim, Argueta-Hernandez provided testimony that El Salvador's prosecutor's office said there was nothing it could do for him except provide a document certifying that he could not stay in El Salvador. Salvadoran police asked Argueta-Hernandez to sign a document waiving its liability if MS-13 finds and tortures him. Following his three-week detainment by the anti-gang unit, Salvadoran police put Argueta-Hernandez in a taxi to the Guatemalan border. Despite finding that the officials from each of the Salvadoran agency offices told him there was nowhere in El Salvador that "he would be safe," the IJ ruled that the Salvadoran government is willing and able to protect Argueta-Hernandez.

On September 23, 2021, the IJ ordered Argueta-Hernandez removed to El Salvador and denied his applications for withholding of removal and deferral of removal under CAT. 8 U.S.C. § 1231; 8 C.F.R. § 1208.16.

Argueta-Hernandez timely appealed the IJ's decision to the BIA. The BIA affirmed[2] and dismissed Argueta-Hernandez's appeal on April 27, 2022. In denying Argueta-Hernandez's claims, the BIA explained that he received only verbal threats and did not suffer any physical harm. It also found that

---

[2] The BIA did not reach the issue of whether Argueta-Hernandez's proposed social groups are cognizable, stating that the putative "lack of past persecution and nexus to a protected ground are dispositive in this case." It considered, however, for purposes of CAT, whether "any future harm to [Argueta-Hernandez] would be inflicted by or with the consent or acquiescence of a public official or other person acting in an official capacity."

"the gang may have had an enhanced interest in exploiting [Argueta-Hernandez] because of the privileges he enjoyed as a Christian" but that "is insufficient to establish that [his] religion and membership in his proposed particular social groups were **central reasons** that the gang subsequently threatened to harm him."  The BIA affirmed, stating that the IJ properly found that gang members never told Argueta-Hernandez that he was "not allowed to preach or otherwise exercise his religious rights; instead, they threatened him for refusing to pay extortion or collaborate with them."

For CAT protection, the BIA explained that there was insufficient evidence to demonstrate government acquiescence to torture, as Salvadoran authorities provided Argueta-Hernandez "with accommodation at an anti-gang safe house and helped facilitate his departure from the country." Accordingly, BIA held that this was dispositive and did not consider whether the IJ erred in determining that Argueta-Hernandez did not suffer past torture.

Argueta-Hernandez filed a petition for review in this court on May 27, 2022, which was within 30 days of BIA's order denying him withholding of removal and CAT relief.  On July 10, 2023, this panel denied Argueta-Hernandez's petition for lack of jurisdiction. *Argueta-Hernandez v. Garland*, 73 F.4th 300, 303 (5th Cir. 2023).  In light of recent and prevailing precedent, however, we grant the petition for rehearing to address our jurisdiction and the merits of Argueta-Hernandez's claims.

## II.  Jurisdiction

Under the Immigration and Nationality Act, we typically review only "final orders of removal" when a petition is filed within 30 days of the order. *Pena Oseguera v. Barr*, 936 F.3d 249, 250 (5th Cir. 2019); 8 U.S.C. § 1252(a)(1), (b)(1).  Here, we must determine whether we have jurisdiction

over the petition for review, which was filed within 30 days of BIA's order but several years after the reinstated removal order.

First, the 30-day filing deadline is not jurisdictional. *See Santos-Zacaria v. Garland*, 598 U.S. 411 (2023). In *Santos-Zacaria*, the Supreme Court explained that contrary to our previous interpretation, *Stone v. INS*, 514 U.S. 386 (1995) did not establish that the exhaustion requirement in 8 U.S.C. § 1252(d)(1) was jurisdictional in nature. *Santos-Zacaria*, 598 U.S. at 421–22, 428. Accordingly, we find that judicial review of Argueta-Hernandez's petition is not time barred by § 1252(b)(1).

Second, we address whether the BIA's order is deemed final for purposes of judicial review. This court has held that an order reinstating a prior removal order is itself a final removal order. *Garcia v. Holder*, 756 F.3d 885, 890 (5th Cir. 2014). Additionally, this court has held that reinstatement orders are deemed "final" under § 1252(b)(1) "only upon completion of reasonable-fear and withholding-of-removal proceedings[.]" *Ponce-Osorio v. Johnson*, 824 F.3d 502, 505–07 (5th Cir. 2016). Since then, however, the Supreme Court has held that an IJ's withholding-only determination is "not itself a final order of removal[.]" *Nasrallah v. Barr*, 140 S. Ct. 1683, 1691 (2020) (explaining that an order denying CAT relief does not "merge into" a preexisting final removal order because it does not "affect the validity of the final order"); *see also Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2288 (2021) ("[T]he order of removal is separate from and antecedent to a grant of withholding of removal.").

This court recently noted that "*Nasrallah* and *Johnson* may mean that a petitioner who wishes to challenge a reinstatement order in federal court must file within 30 days of the reinstatement order—without waiting for withholding-only proceedings to conclude." *Ruiz-Perez v. Garland*, 49 F.4th 972, 975–76 (5th Cir. 2022) (noting further that "a panel of this court would

No. 22-60307

need to conclude that *Nasrallah* and *Johnson* unequivocally overruled prior precedent before applying new jurisdictional rules to our review of reinstatement orders"). The court in *Ruiz-Perez* declined to reach whether *Nasrallah* and *Johnson* overruled *Ponce-Osorio*, but that issue is now squarely before this panel. We address it in a similar fashion as our sister circuits.[3]

Neither *Nasrallah* nor *Johnson* overrules this court's precedent. In *Nasrallah*, the "narrow question before" the Supreme Court concerned the scope of review for a CAT protection claim. 140 S. Ct. at 1688. *Nasrallah* did not address jurisdiction or reinstatement proceedings, and it declined to consider arguments regarding its impact on statutory withholding orders. *Id.* at 1694 ("That question is not presented in this case, and we therefore leave its resolution for another day."). While *Nasrallah* held that an order denying CAT relief is not "final," we may still review such an order "together with final orders of removal." *Id.* at 1690.

Furthermore, *Johnson* concerned the finality of removal orders for purposes of detention under § 1231, not for judicial review under § 1252. 141 S. Ct. at 2280. The Court distinguished the language used in the detention statute (§ 1231) from that used in the statute governing judicial review of removal orders (§ 1252); it declined to address the interpretation of the latter. *Id.* at 2285 n.6 ("We express no view on whether the lower courts are correct in their interpretation of § 1252, which uses different language than § 1231 and relates to judicial review of removal orders rather than detention.").

---

[3] *See Kolov v. Garland*, 78 F.4th 911, 919 (6th Cir. 2023); *Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1140–43 (10th Cir. 2023); *Alonso-Juarez v. Garland*, 80 F.4th 1039, 1048–55 (9th Cir. 2023); *see also Carmen Amanda Barrios Duenas v. Att'y Gen.*, No. 22-3024, 2023 WL 6442601, at *3–4 (3d Cir. Oct. 3, 2023) (unpublished).

No. 22-60307

We may consider the IJ's reinstatement order removing Argueta-Hernandez to El Salvador, as affirmed by the BIA, because *Nasrallah* and *Johnson* comport with our earlier precedent. *See Ponce-Osorio*, 824 F.3d at 505–07. On rehearing, both parties agree with this logic.[4] "[F]or a Supreme Court decision to change our Circuit's law, it 'must be more than merely illuminating with respect to the case before [the court]' and must 'unequivocally' overrule prior precedent." *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (internal citations omitted). It cannot be the case that a petitioner may only seek review before reinstatement of a removal order, and without a full administrative record. A decision to the contrary could have disastrous consequences on the immigration and judicial systems.[5]

Therefore, this court has jurisdiction to consider Argueta-Hernandez's timely petition for review regarding withholding of removal and protection under the CAT.

---

[4] Argueta-Hernandez separately raises a third basis for jurisdiction: the IJ's order reinstating his removal specified that the "decision is final <u>unless</u> an appeal is filed with the Board of Immigration Appeals within 30 calendar days of the date of the mailing of this written decision." Because Argueta-Hernandez filed an appeal with the BIA, his argument that the decision is final based on the aforementioned language alone is not persuasive.

[5] If that was our reality, it would be "immensely resource intensive" as numerous noncitizens would file premature petitions for review. For example, "[i]t would lead to an increase in filings, as petitioners would inevitably have to file a petition for review to preserve the possibility of judicial review, even when unsure if they would need to, or even choose to, challenge the decision in the future[,]" which in turn "would require our court to dedicate resources to tracking and closing moot or abandoned petitions" and "to establish a system of holding petitions for review in abeyance for years at a time." *Alonso-Juarez*, 80 F.4th at 1053.

8

No. 22-60307

### III. Standard of Review

We typically review the BIA's decision and may consider the IJ's decision when it has influenced the BIA's determinations. *Gomez-Palacios v. Holder*, 560 F.3d 354, 358 (5th Cir. 2009) (citing *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 348 (5th Cir. 2002)). We accept "administrative findings" as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Garland v. Ming Dai*, 141 S. Ct. 1669, 1681 (2021). This court reviews factual findings of the BIA for substantial evidence, and questions of law de novo, giving considerable deference to the BIA's interpretation of the legislative scheme it is entrusted to administer. *Zhu v. Gonzales*, 493 F.3d 588, 594 (5th Cir. 2007); *Nasrallah* 140 S. Ct. at 1692. Under the substantial evidence standard, we may not reverse a factual finding unless the evidence "compels" such a reversal— i.e., the evidence must be "so compelling that no reasonable factfinder could conclude against it." *Reyes-Hoyes v. Garland*, No. 20-60133, 2023 WL 3075064, at *3 (5th Cir. Apr. 25, 2023) (per curiam) (citing *Wang v. Holder*, 569 F.3d 531, 536–37 (5th Cir. 2009)). It is the petitioner's burden to demonstrate that the evidence compels a contrary conclusion. *Zhao*, 404 F.3d at 306. We may only affirm the BIA based on its stated rationale. *Vazquez v. Sessions*, 885 F.3d 862, 870 (5th Cir. 2018).

### IV. Withholding of Removal

Argueta-Hernandez argues that the BIA's ruling is legally erroneous because it required a showing of physical harm to establish persecution, and it disregarded death threats and MS-13's attempt to kill his son. He also argues that the BIA did not meaningfully consider his religious and liberty deprivations, psychological harm, and cumulative harm. In addition, he argues that the BIA's nexus ruling is erroneous because it considered neither evidence of mixed motives nor one of his proposed particular social groups,

and it improperly relied on dissimilar case law.    In response, the government's arguments mostly mirror the BIA and IJ's decisions.

### A. Past Persecution

To obtain a grant of withholding of removal, an applicant must establish a clear probability that his life or freedom will be threatened in the country of removal because of his race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. § 1231(b)(3)(A); *INS v. Stevic*, 467 U.S. 407, 429–30 (1984).  The applicant must demonstrate that the statutorily protected characteristic was or will be "at least one central reason" for the persecution he claims. *Matter of C-T-L-*, 25 I. & N. Dec. 341, 344 (BIA 2010); *see Gonzales-Veliz v. Barr*, 938 F.3d 219, 224 (5th Cir. 2019); *Shaikh v. Holder*, 588 F.3d 861, 864.  The statutorily protected ground cannot be "incidental, tangential, superficial, or subordinate to another reason for harm."  *Shaikh*, 588 F.3d at 864 (internal citation and quotation omitted).

In addition, to find persecution, "[t]he harm or suffering need not be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." *Abdel-Masieh v. U.S. I.N.S.*, 73 F.3d 579, 583 (5th Cir. 1996) (internal citation omitted); *see Tamara-Gomez v. Gonzales*, 447 F.3d 343, 348–49 (5th Cir. 2006); *Morales Lopez v. Garland*, 852 F. App'x 758, 772–73 (5th Cir. 2021).  "Examples of persecution" can include "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Morales v. Sessions*, 860 F.3d 812, 816 (5th Cir. 2017) (quoting *Fei Mei Cheng v. Att'y Gen. of U.S.*, 623 F.3d 175, 192 (3d Cir. 2010)).  Moreover, threats of violence against family members can support a finding of persecution so long as they are coupled with threats made directly to the petitioner. *See, e.g.*, *Tamara-Gomez*, 447 F.3d at 349 (concluding that the record compelled a finding of

persecution where it included, among other things, "threats of violence and acts of vandalism" against the asylum applicant's family); *Abdel-Masieh*, 73 F.3d at 583 (concluding that the suffering or harm necessary to a finding of persecution can include "deprivation of liberty, food, housing, employment or other essentials of life" (internal quotation marks and citation omitted)).

Other circuits have similarly held that physical harm is not required for persecution. *See, e.g.*, *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 111 (3d Cir. 2020) ("[T]he IJ and BIA erred . . . in conditioning a finding of past persecution based on verbal threats on a showing of physical violence to Petitioner."); *Portillo Flores v. Garland*, 3 F.4th 615, 629 (4th Cir. 2021) (en banc) ("Upon remand, the BIA should bear in mind that the harm need not be physical."); *Juan Antonio v. Barr*, 959 F.3d 778, 793 (6th Cir. 2020) (explaining that "physical abuse is not an absolute prerequisite to a finding of persecution" (quoting *Japarkulova v. Holder*, 615 F.3d 696, 700 (6th Cir. 2010))).

Furthermore, to show a well-founded fear of persecution, the applicant "must show that a reasonable person in the same circumstances would fear persecution if deported." *Orellana-Monson v. Holder*, 685 F.3d 511, 518 (5th Cir. 2012) (citing *Jukic v. INS*, 40 F.3d 747, 749 (5th Cir. 1994)). "The subjective fear of future persecution must be objectively reasonable." *Id.* (citing *Mikhael v. INS*, 115 F.3d 299, 304 (5th Cir. 1997)). A "reasonable degree" can mean a ten percent chance. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987).

### *1. Severity of Harm*

The BIA determined that the harm Argueta-Hernandez "suffered—including approximately five phone threats, surveillance, and an incident where a gang hitman followed his son—is not severe enough to rise to the level of persecution." Focusing on the lack of physical harm to Argueta-

Hernandez, the BIA stated that he "received only verbal threats and did not suffer any physical harm." In doing so, the BIA also categorizes MS-13's hitman attempt on Argueta-Hernandez's son as non-threatening. Argueta-Hernandez contends that by effectively requiring physical injury to establish past persecution, the BIA and IJ erred.

We agree. Threats of death and other serious harms constitute persecution when they are objectively credible. *Zhu*, 493 F.3d at 598–99. Here, the IJ found, and the BIA affirmed, that the Salvadoran authorities deemed MS-13's threats as credible and imminent. Moreover, because the asylum officer and immigration courts deemed Argueta-Hernandez credible, and evidence corroborated his testimony that he repeatedly received death threats from MS-13, he has presented crucial factors for establishing persecution. *See, e.g.*, *Tamara-Gomez*, 447 F.3d at 348–49; *Portillo Flores*, 3 F.4th at 635.

In its analysis of the death threats, the BIA relied on *Morales v. Sessions*, 860 F.3d at 816, for the proposition that "persecution generally 'requires more than a few isolated incidents of verbal harassment or intimidation.'" But in *Morales*, there was only one "isolated, verbal threat of future violence" coupled with testimony from a non-credible source of a second threat. 860 F.3d at 816–17. Here, by contrast, there were not just a "few isolated incidents of verbal harassment," but rather several sustained credible death threats by MS-13 against Argueta-Hernandez and his family— threats so credible that numerous Salvadoran officials told Argueta-Hernandez to flee the country.

The BIA also cited *Arif v. Mukasey*, 509 F.3d 677, 680 (5th Cir. 2007), for the proposition that "persecution is an extreme concept that does not include every sort of treatment our society regards as offensive." While it is true that not all "offensive" treatment qualifies as persecution—name-

calling, for example, is not persecution, *see Matter of V-F-D-*, 23 I&N Dec. 859, 863–64 (BIA 2006)—it is equally true that repeated credible death threats *do* constitute persecution. *See Tamara-Gomez*, 447 F.3d at 349.

Moreover, *Arif* is distinguishable. There, the petitioner "d[id] not state an independent ground for withholding of removal, relying instead on her husband's proffered persecution and insisting that she is a derivative beneficiary of the application filed by her husband." 509 F.3d at 681. There was no discussion of harm—physical or otherwise. *See Portillo Flores*, 3 F.4th at 627 ("[W]e do not condition a finding of past persecution on whether the victim required medical attention or even on whether the victim was physically harmed at all. Nor do we reduce our persecution analysis to a checklist or measure the severity of an injury in stitches." (quoting *Blanco v. Att'y Gen.*, 967 F.3d 304, 311 (3d Cir. 2020) (internal quotations marks omitted))).

*Tamara-Gomez v. Gonzales* is instructive. Tamara-Gomez and his family received repeated phone calls threatening him and his family, and when they moved to another house, the threatening phone calls resumed "within weeks." *Tamara-Gomez*, 447 F.3d at 346. When "a bicycle bomb exploded in Tamara-Gomez's new neighborhood, killing five (none of the victims were members of Tamara-Gomez's family)[,]" him and his family fled to the United States. *Id.* Nonetheless, the IJ determined that Tamara-Gomez did not establish past persecution, and "found the 'bomb incident' to be 'a random act of violence all too common in Colombia and unrelated to the respondent or his wife.'" *Id.* at 348 n.6. This court disagreed, concluding: "[c]onsidered in isolation the bike bomb may in fact have been a 'random act of violence.' Yet, in the light of the other occurrences it is not unreasonable to believe that the bomb was targeted at Tamara-Gomez and/or his family." *Id.* at 348 n.7.

Similarly, here MS-13 persistently threatened Argueta-Hernandez, and when he stopped answering his phone, the gang sent a man to his home to convey the gang's threats. Argueta-Hernandez had received a call from the MS-13 gang leader threatening to kill his family members shortly before an assassin and another gang member followed his son and attempted to kill him. Then, a gang member called Argueta-Hernandez and confirmed that they had tried (and would continue trying) to kill his son. As in *Tamara-Gomez*, the BIA "discarded all evidence of persecution" even though it did not dispute the IJ's finding that Argueta-Hernandez is "credible and accept[ed] his account of the facts." *Id.* at 348 (internal quotation marks omitted).

Moreover, Argueta-Hernandez contends that the BIA improperly asserted that a persecutor must specifically reference his victim's religious practices for the latter to suffer harm. We agree with Argueta-Hernandez that such finding is legally and factually unsupported. And to the extent that the BIA conflates the severity of harm and nexus analyses, it "committed legal error by requiring that [he] prove" motive to establish persecution. *Eduard v. Ashcroft*, 379 F.3d 182, 192 (5th Cir. 2004) (holding that where the record and findings show a pattern of persecution based on Christianity in a country, "[p]etitioners were not required to show that they would be singled out for persecution upon return"). Based on the cumulative evidence before the BIA and IJ, Argueta-Hernandez has sufficiently shown a severity of harm for past persecution. Where the court has "evidence of regular and methodical targeting," it "[has] not hesitated to find persecution." *See Gjetani v. Barr*, 968 F.3d 393, 398 (5th Cir. 2020) (citing *Tamara-Gomez*, 447 F.3d 343).

As Argueta-Hernandez suffered past persecution in El Salvador, a regulatory presumption arises that he would face future persecution if he returned to El Salvador. 8 C.F.R. § 208.16(b)(1)(I); *Zhu*, 493 F.3d at 599.

This presumption may be rebutted, but only if the government can prove by a preponderance of the evidence that (1) there has been a fundamental change of conditions that removes the threat to the applicant, or (2) the applicant could avoid the threat by relocating to another part of the country. *Zhu*, 493 F.3d at 596–97. Because the government has not suggested that there has been a fundamental change in conditions or that Argueta-Hernandez can relocate within El Salvador, there is an indication that he will face future persecution.

### *2. Nexus*

Argueta-Hernandez argues that BIA wrongly asserts that he must show MS-13 sought to harm him in order to overcome a protected characteristic. He also argues that BIA treated the nexus requirement as an either-or proposition, in which MS-13 either acted for one reason or another, but not both. Separately, Argueta-Hernandez contends that the BIA and IJ failed to consider one of the proposed particular social groups.

Withholding of removal requires an applicant showing a threat to his or her life or freedom "because of" race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). The applicant must demonstrate that one of those five enumerated characteristics "was or will be **at least one central reason** for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added). Because "the nexus requirement is not an 'either-or' proposition," a court must consider the existence of multiple motives for the persecutor's actions when such evidence exists. *Ontunez-Tursios*, 303 F.3d at 349; *see also Rivas-Martinez v. I.N.S.*, 997 F.2d 1143, 1148 (5th Cir. 1993) (remanding to BIA for consideration of mixed motives). "[A]lthough a statutorily protected ground need not be the only reason for harm, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Cabrera v. Sessions*,

890 F.3d 153, 159 (5th Cir. 2018) (quoting *Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 383 (5th Cir. 2016)); *see Sealed Petitioner*, 829 F.3d at 383 ("[P]ersecutors may have legitimate reasons for their actions, but an additional central reason for their actions is persecution on account of a protected category."); *see Berhe v. Barr*, 837 F. App'x 255, 258 (5th Cir. 2020)(remanding to the BIA for further consideration). To satisfy this nexus requirement, an applicant need only present "'some particularized connection between the feared persecution'" and the protected characteristic. *Roy v. Ashcroft*, 389 F.3d 132, 138 (5th Cir. 2004) (quoting *Faddoul v. I.N.S.*, 37 F.3d 185, 188 (5th Cir. 1994)).

The BIA and IJ stated that the threats, which included extortion and death, were not motivated by Argueta-Hernandez's religion or membership in a protected social group, "but rather by criminal intent, personal vendettas, or monetary gain, which do not establish the required nexus." By characterizing MS-13's threats against Argueta-Hernandez and his family as solely extortion, BIA disregards that he needed only to present "'some particularized connection between the feared persecution'" and the protected ground in which his application for relief relies. *Id.* at 138. Contrary to the BIA's analysis, nothing requires Argueta-Hernandez to show that MS-13 explicitly said "he was not allowed to preach or otherwise exercise his religious rights." *See, e.g.*, *In Re S-P-*, 21 I. & N. Dec. 486, 489 (BIA 1996) ("An asylum applicant is not obliged to show conclusively why persecution has occurred or may occur. Such a rigorous standard would largely render nugatory the Supreme Court's decision in *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).").

Furthermore, the BIA agreed with the IJ's finding that MS-13 targeted Argueta-Hernandez "for extortion and collaboration because of his successful business, contacts, and reputation in his town," but these circumstances are not mutually exclusive. For example, in *Rivas-Martinez*,

this court held that the BIA incorrectly applied an "either-or" analysis when the petitioner provided political and non-political reasons for refusing to help her alleged persecutors in El Salvador. 997 F.2d at 1145, 1147–48 (remanding to the BIA because it relied solely on the non-political reasons, rather than political reasons, to deny the petitioner relief). Although the petitioner in *Rivas-Martinez* offered a non-political excuse, it was error for the BIA to categorically prevent her from showing political persecution through other evidence. *Id.* at 1147; *see Ontunez-Tursios*, 303 F.3d at 349; *Berhe*, 837 F. App'x at 257–59. Here, the IJ and BIA similarly suggested that MS-13 targeted Argueta-Hernandez for economic gain "instead" of religious reasons despite evidence to the contrary. Although MS-13's initial threats followed Argueta-Hernandez's refusal to pay rent to and collaborate with MS-13, he claims that more threats were made in the subsequent years that were motivated by his religion and status in the Christian church. For example, Argueta-Hernandez was repeatedly told that his status as an Evangelical Christian leader was the reason he was targeted by MS-13. According to Argueta-Hernandez's testimony, the leader of the gang said the following: "This is why we are doing this to you because you are Christian and you are good with God and that is why we looked for you." Moreover, reports indicated that gang threats to religious individuals are prevalent, and "the risk of torture or death as extremely likely for [Argueta-Hernandez]." Finally, as the IJ acknowledged, it was only after Argueta-Hernandez became President of Evangelism that the gang began targeting him. The IJ found this information to be credible and corroborated but denied Argueta-Hernandez's claims.

While it is possible that Argueta-Hernandez's alleged persecutors were motivated by "his reputation as a good person and businessman in the

community," this does not necessarily disprove nexus.[6]  Community members, police officers, and MS-13 considered Argueta-Hernandez a good person because he was a well-known religious leader who was "not doing bad things."  Even if his good reputation was entirely distinct from his religious practice, the words and actions of his persecutors could demonstrate that his religion was still one central reason for his persecution.  If we allow BIA's analysis to stand as-is, we run the risk that anything can be recharacterized as "incidental" or "tangential" under the BIA's logic.

Finally, Argueta-Hernandez contends that the IJ failed to consider one of his proposed social groups ("Salvadoran informants against gang members").  The BIA acknowledged the IJ's error, then made the same mistake by stating that it was irrelevant, as the "central reason" for the gang's harm was extortion.  The BIA commits reversible error by failing to adequately consider whether an applicant belongs to an alleged social group and whether he had a well-founded fear of persecution.  *Cabrera*, 890 F.3d at 163 ("[W]e must remand for the agency to comply with its established responsibility." (internal citations omitted)).

––––––––––––––––––––––––––––

[6] The BIA stated that "[e]ven assuming, arguendo, that the applicant's religion and membership in his proposed particular social groups **are potential reasons for the gang's enhanced interest in extorting and collaborating with the applicant**, the applicant has not provided sufficient evidence to establish that the gang harmed or will harm him in order to overcome a protected characteristic."  It is not clear whether the BIA intended to invoke a mixed-motive analysis here, but if so, the BIA should have identified how substantial evidence regarding religious persecution may be whittled to an "enhanced interest in extorting and collaborating."  The facts in this case could suggest otherwise.  For example, a gang could choose to extort an individual based on the perceived social, political, or economic benefits that a religious individual may have.  And when, as here, a religious individual refuses to assist that gang because of his beliefs, the BIA and IJ should consider that as substantial and critical evidence supporting the petitioner's claim.  *See, e.g.*, *Rivas-Martinez*, 997 F.2d at 1145, 1147–48.  It is improper, however, to broadly exclude asylum applicants who resist an alleged persecutor, and who are also persecuted for several reasons including, but not limited to, extortion.

No. 22-60307

As a result, we vacate and remand the BIA's decision on the past persecution and nexus analysis for lack of substantial evidence and analysis to support it. On remand, the BIA should consider that the harm need not be physical. It should also recognize that death threats need not be made directly to the petitioner, and in this case, both the petitioner and his family were threatened. Further, the BIA should acknowledge that extortion may, in certain circumstances, not destroy a petitioner's claim where other facts establish nexus. The BIA should bear in mind that persecutors may have multiple motives, and those motives are not necessarily directly disclosed to the petitioner but can be shown through evidence (i.e., credible testimony, police reports). The facts may demonstrate that religious persecution and extortion coexist. On remand, the BIA should clarify its analysis in light of the aforementioned issues and authority.

## V. Convention Against Torture

Argueta-Hernandez argues that the BIA, affirming the IJ, disregarded evidence that would support granting protection under CAT. The IJ and BIA concluded that Argueta-Hernandez failed to show the El Salvadoran government was unable or unwilling to protect him.[7] The BIA held that the evidence did not show that a Salvadoran public official or other person acting in an official capacity "would turn a blind eye [to Argueta-Hernandez's] future torture by gang members" because authorities provided him with "accommodation at an anti-gang safe house and helped facilitate his

_____

[7] In the context of CAT, the BIA considers whether the Salvadoran government is unwilling or unable to protect Argueta-Hernandez. Its analysis flows from the IJ's decision subpart entitled "Inflicted by Government or Organization Government is Unwilling or Unable to Protect Respondent from." The BIA declined to reach the issue of past torture. Thus, to the extent BIA considers the Salvadoran government's actions, we address it in turn.

departure from the country[.]" Argueta-Hernandez argues that such holding is legally and factually unsupported.

We agree. A petitioner is eligible for CAT relief if he can "establish that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). The regulations define "torture" to include "any act by which severe pain or suffering . . . is intentionally inflicted on a person" by or with the acquiescence of a public official for informational, punitive, coercive, or discriminatory purposes. *Id.* § 1208.18(a)(1); *see Arulnanthy v. Garland*, 17 F.4th 586, 597–98 (5th Cir. 2021). A public official acquiesces to torture when he or she has prior "awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7) ("Such awareness requires a finding of either actual knowledge or willful blindness."). An applicant may satisfy his burden of proving acquiescence by demonstrating "a government's willful blindness of torturous activity." *Iruegas-Valdez v. Yates*, 846 F.3d 806, 812 (5th Cir. 2017) (quoting *Hakim v. Holder*, 628 F.3d 151, 155 (5th Cir. 2010)).

The CAT imposes specific requirements on IJs and the BIA. Though past torture is not enough for CAT relief, the immigration courts must consider "all evidence relevant to the possibility of future torture" when deciding whether future torture is more likely than not. 8 C.F.R. § 1208.16(c)(3)(i); *see Arulnanthy,* 17 F.4th at 597–98. They must also consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and any "[o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3) (listing other required considerations).

Our precedent imposes its own requirement: CAT claims are "distinct from asylum and withholding-of-removal claims and should receive

separate analytical attention." *Arulnanthy,* 17 F.4th at 598 (quoting *Santos-Alvarado v. Barr*, 967 F.3d 428, 436 (5th Cir. 2020)); *see also Efe v. Ashcroft*, 293 F.3d 899, 907 (5th Cir. 2002) (cautioning against "overreliance on an adverse credibility ruling" in the CAT context).

After Argueta-Hernandez reported MS-13's attempt to kill his son, four governmental agencies in El Salvador told him that they cannot protect him or his family. As the IJ acknowledged, "[t]he officials from each office all told [Argueta-Hernandez] that there was nowhere in El Salvador where he would be safe."[8] We find, however, that no "reasonable adjudicator could have found as the agency did." *See Ming Dai*, 141 S. Ct. at 1678; *see also Portillo Flores*, 3 F.4th at 635 (holding that "[p]urported Salvadoran efforts to combat gang violence and corruption in general do not excuse the agency's failure to support its decision with the proper legal and factual analysis of Petitioner's specific circumstances"). In ruling that Argueta-Hernandez had not established government acquiescence, the BIA and IJ failed to take the facts into consideration.

The BIA improperly determined that temporarily placing Argueta-Hernandez in a safehouse and "facilitating" his departure was evidence of a willingness to protect him from MS-13. According to Argueta-Hernandez's testimony, the prosecutor's office confirmed that there was "not much" it "could do" for him, except have him sign a document certifying that he

---

[8] A Salvadoran police sergeant pulled up his file and saw the report Argueta-Hernandez made against the gang, and repeatedly told him that he "cannot be here in this country" and that he was "cooked." The Office of Human Rights stated that there was not much they could do because gang members were always watching hi" and MS-13 was "everywhere." The Anti-Gang Unit said that "if [he] didn't want to show up dead in a gutter . . . [he] could not be in El Salvador." A representative from El Salvador's District Attorney's office also said that he cannot live in El Salvador: "Gang members are in every part of the country and wherever [he goes] they will find [him]."

"could not stay in El Salvador." And the BIA and IJ's reliance on the fact that the anti-gang unit put Argueta-Hernandez in a taxi to Guatemala does not negate that he is no longer safe or protected in El Salvador. In affirming the IJ, the BIA concluded that it is insufficient for CAT that the Salvadoran government acknowledged MS-13 "will kill" Argueta-Hernandez if he stays in El Salvador and should sign a liability waiver if he remains in El Salvador. In doing so, the BIA failed to consider "all evidence relevant to the possibility of future torture." *See* 8 C.F.R. § 1208.16(c)(3)(i); *Arulnanthy*, 17 F.4th at 597–98.[9]

The BIA and IJ's analysis are also legally unsupported. In denying Argueta-Hernandez's claims, the agencies cite *Ramirez-Mejia v. Lynch*, 794 F.3d 485 (5th Cir. 2015) and *Martinez Manzanares v. Barr*, 925 F.3d 222 (5th Cir. 2019). In *Ramirez-Mejia*, the petitioner "alleged that officials advised her to leave the country" after she received gang threats, but "she did not allege that the officials expressed any intent to acquiesce in her torture if she did not leave." 794 F.3d at 494 (explaining that police "insisted that she file a report against" a gang member that threatened her). Likewise, the petitioner in *Martinez Manzanares* argued that "the Honduran government was 'willfully blind' to his persecution," but admitted that "he never reported [his attacker's] threats to the police," and did not allege that he "asked the mayor to have the police investigate the incident—much less that the mayor refused." 925 F.3d at 228.

---

[9] "[A] failure to mention 'key evidence' like this raises too great a concern that the BIA did not adequately consider the evidence before it." *Emmanuel-Tata v. Garland*, 2022 WL 126982, at *3 (5th Cir. Jan. 12, 2022) (unpublished) ("We therefore reverse the BIA's decision. We need not further consider the BIA's factual determinations" (citing 8 C.F.R. § 1208.16(c)(3); *Arulnanthy*, 17 F.4th at 598; *Abdel-Masieh*, 73 F.3d 579 at 585)).

No. 22-60307

Here, by contrast, the Salvadoran government stated multiple times that MS-13 "will kill" Argueta-Hernandez if he returns to El Salvador, and its efforts to obtain a waiver could show that if he returns, it will not prevent that outcome. And despite finding this information credible and corroborated, the IJ denied Argueta-Hernandez's claims without appropriate legal analysis.

Therefore, we vacate BIA's decision on Argueta-Hernandez's CAT claim and remand for further analysis. The IJ and BIA underexplained their assessment of his argument and disregarded evidence of his CAT claim.

## VI. Conclusion

For the foregoing reasons, we GRANT the petition for review, REVERSE the BIA's decision, and REMAND for proceedings consistent with this opinion.