# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 25, 2024

Lyle W. Cayce
Clerk

————————

No. 23-60203

————————

L.N.,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

———————————————————————

Appeal from the Board of Immigration Appeals
Agency No. A216 541 190

———————————————————————

Before Jones, Douglas, *Circuit Judges*, and Doughty, *Chief District Judge*.[*]

Edith H. Jones, *Circuit Judge*:

L. N., a native and citizen of Angola, seeks review of a final order of removal issued by the Board of Immigration Appeals ("BIA" or "Board"). In affirming the Immigration Judge's ("IJ") decision, the BIA denied L. N.'s applications for asylum, withholding of removal, and protection pursuant to the Convention Against Torture ("CAT"). Because the BIA sufficiently

———————————————

[*] Chief United States District Judge for the Western District of Louisiana, sitting by designation.

considered the record before it and substantial evidence supports its decision, we DENY the petition for review.

## I

According to L. N., two individuals murdered her father and members of her family in 1998 because her father had opposed corruption in the Angolan government. Between 2003 and 2017, three incidents occurred which, according to L. N., evidence persecution of her for her and her father's opposition to corruption in Angola. The first incident occurred in Angola in 2008 when L. N. "woke up to find that individuals had shot at her home during the night." The second incident occurred eight years later while she was living in Ecuador, and "two individuals dressed in native Angolan clothing approached her, grabbed her by the hair, and put a gun under her nose." After she returned to Angola, a third incident occurred in 2017 when her "house in Angola was set on fire" and "flyers [were] left outside her home which she believed related to her father's reporting of corruption."

L. N. left Angola for the United States and sought asylum, withholding from removal, and protection under the CAT. In a seventeen-page order, the IJ denied her claims and ordered her removed from the United States. The IJ found that L. N. failed to establish a well-founded fear of persecution in Angola.

L. N. appealed the IJ's decision. In a short order, the BIA remanded to the IJ to make findings regarding Dr. Johannes Schubert's expert testimony and "address the feasibility and reasonableness of internal relocation" within Angola.

On remand, the IJ did just that and again concluded that L. N. was not entitled to the relief she sought and ordered her removed. The BIA affirmed

the IJ's findings and dismissed L. N.'s appeal. L. N. petitions for review of the BIA's decision.

## II

Although our review is generally limited to the BIA's decision, "when the IJ's ruling affects the BIA's decision, as it does here, we review the decisions of both the BIA and the IJ." *Tibakweitira v. Wilkinson*, 986 F.3d 905, 910 (5th Cir. 2021). "Factual findings are reviewed for substantial evidence, and constitutional claims and questions of law are reviewed de novo." *Id.* (citing *Fuentes-Pena v. Barr*, 917 F.3d 827, 829 (5th Cir. 2019)). Under the substantial evidence standard, "the BIA's finding is conclusive unless, based on the evidence presented in the record, any reasonable adjudicator would be compelled to conclude to the contrary." *Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 383 (5th Cir. 2016) (quoting *Martinez-Martinez v. Holder*, 769 F.3d 897, 899 (5th Cir. 2014)).

## III

Asylum is "available where 1) a person is 'unwilling to return to' their home country 'because of persecution or a well-founded fear of persecution'; and 2) the applicant has demonstrated that 'race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant.'" *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 348 (5th Cir. 2006) (quoting 8 U.S.C. §§ 1101(a)(42), 1158(b)). If the alleged persecution is committed by a private party, the asylum-seeker must also show that the government officials are unable or unwilling to help. *Bertrand v. Garland*, 36 F.4th 627, 631–32 (5th Cir. 2022).

To be eligible for withholding of removal, "an applicant must demonstrate a 'clear probability' of persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion." *Chen v. Gonzales*, 470 F.3d 1131, 1138 (5th Cir. 2006). Withholding of

removal requires a higher standard than asylum, so a party who fails to show eligibility for asylum necessarily cannot show eligibility for withholding. *Gonzales-Veliz v. Barr*, 938 F.3d 219, 224 (5th Cir. 2019). If a petitioner fails to establish any one of the elements of asylum or withholding, her claim fails, and the court need not consider her arguments concerning the remaining elements of those forms of relief. *INS v. Bagamasbad*, 429 U.S. 24, 25, 97 S. Ct. 200, 201 (1976); *Munoz-De Zelaya v. Garland*, 80 F.4th 689, 693–94 (5th Cir. 2023).

To obtain CAT protection, an applicant "must demonstrate that, if removed to a country, it is more likely than not [she] would be tortured by, or with the acquiescence of, government officials acting under the color of law." *Hakim v. Holder*, 628 F.3d 151, 155 (5th Cir. 2010).

L. N. raises four arguments on appeal. First, she argues that the BIA erred by failing to adequately consider evidence of state-sponsored persecution and, had it done so, it would have concluded she suffered persecution at the hands of the Angolan government. Second, she asserts the record evidence compels a determination that the Angolan government was unwilling or unable to protect her and remains unwilling to do so. Third, she contends the BIA erred in failing to bifurcate its analysis of past and future inability to protect her. Finally, she argues the evidence compels reversal on her CAT claim. We address each argument in turn.

## A

L. N. argues we should reverse and remand because the BIA failed to adequately consider evidence of state-sponsored persecution and explain its reasons for dismissal. She also contends that "the evidence compels a finding of the involvement of the Angolan government in [her] persecution." But the record refutes these arguments and demonstrates that substantial

4

evidence supports the BIA's conclusion that she did not suffer state-sponsored persecution.

1.

L. N. claims the BIA failed to give her a fair shake by not considering evidence that the Angolan government itself persecuted her. However, the IJ averred on remand that "[a]ll admitted evidence was considered in its entirety[.]" The IJ's orders extensively recount L. N.'s testimony.[1] The IJ's account of her testimony encompasses her description of the shrouded nature of the trial that resulted in the imprisonment of two individuals (for 18 years) for murdering her family members. His account also includes each of the incidents of harm she experienced, including the 2008 incident at her home. On remand from the BIA, the IJ addressed Dr. Schubert's testimony and the country conditions evidence. The IJ found that this evidence did "not support a finding that [L. N.] will suffer persecution if she returns to Angola" and explained why he arrived at that conclusion. Ultimately, the BIA agreed with the IJ's view of the evidence. It misreads the record to conclude, as the dissent does,[2] that the BIA and IJ failed to consider and weigh all of the evidence before them.

---

[1] The dissent makes much of the fact that the IJ credited L. N.'s testimony but nevertheless denied her the relief she requested. *Post,* at 17–19. But "even if the BIA treats an alien's evidence as credible, the agency need not find his evidence persuasive or sufficient to meet the burden of proof." *Garland v. Ming Dai*, 593 U.S. 357, 371, 141 S. Ct. 1669, 1680 (2021); *see also Bertrand*, 36 F.4th at 631 & n.3 (stating we apply the same deferential substantial evidence standard of review, even where "we must accept the alien's version of the facts because the IJ did not make a credibility determination"). Thus, aliens are often denied asylum despite credible testimony. *See, e.g.*, *Chehab v. Holder*, 538 F. App'x 466, 468, 470, 472 (5th Cir. 2013) (per curiam) (denying petition for review where "the IJ reasoned that even were [the petitioner] credible, he would still be ineligible for asylum" for other reasons).

[2] Indeed, the dissent concedes:

Requiring a second remand under these circumstances is also contrary to this circuit's case law.  This court has declined to remand where the BIA and the IJ afforded *less* attention to the pertinent record evidence than the BIA and IJ did here.  An unpublished decision in *Melendez-Monge v. Garland*, No. 20-60814, 2022 WL 1532641 (5th Cir. May 16, 2022) (per curiam), although not precedential, is instructive.  There, "the IJ did not explicitly consider [the] country reports in her analysis of each of [the petitioner's] claims, nor did the BIA explicitly mention the reports in adopting the IJ's decision and reasoning."  *Id.* at *2.  But remand was "not warranted" because "the IJ stated that 'the Court considered . . . respondent's supporting documents . . . including the El Salvador Human Rights Report.'"  *Id.*  The IJ's statement that she considered this evidence "overc[ame] [this court's] 'concern that the BIA did not adequately consider the evidence before it.'"  *Id.* (quoting *Emmanuel-Tata v. Garland*, No. 20-60487, 2022 WL 126982, at *3 (5th Cir. Jan. 12, 2022).  In this case, as just discussed, the IJ did *more* than simply state that he considered the evidence.

L. N. also inists upon remand because the BIA failed to "explain" why "key" evidence in the record does not support her assertion that the Angolan government was responsible for her persecution.  But it is the Petitioner's burden to prove her entitlement to refugee status as a person who is unable or unwilling to return to her country of nationality due to past persecution or a well-founded fear of persecution on a protected ground.  8 U.S.C.

---

The BIA remanded for further proceedings, concluding that the IJ failed to make findings concerning the opinion of her expert, country conditions, the Angolan government's willingness and ability to protect her, and internal relocation.  On remand, the IJ then *addressed these aspects of her claim* but again denied relief, and the BIA subsequently dismissed the appeal.

*Post*, at 17 (emphasis added).

§§ 1101(a)(42), 1158(b)(1)(B)(i), 1231(b)(3)(A); *Garland v. Ming Dai*, 593 U.S. 357, 362, 141 S. Ct. 1669, 1675 (2021). Moreover, "[t]here is no requirement that the BIA address evidentiary minutiae or write any lengthy exegesis[.]" *Parada-Orellana v. Garland*, 21 F.4th 887, 894 (5th Cir. 2022) (citation and quotations omitted). Its decision must simply "reflect meaningful consideration of the relevant substantial evidence supporting the alien's claims." *Abdel-Masieh v. I.N.S.*, 73 F.3d 579, 585 (5th Cir. 1996). Thus, "[w]hen the BIA's decision is neither inconsistent with [the evidence at issue] nor gives reason to believe the BIA was unaware of it, we have no reason to doubt that the agency considered the evidence." *Domingo-Mendez v. Garland*, 47 F.4th 51, 58 (1st Cir. 2022) (alteration in original) (citation and quotations omitted). Accordingly, we have frequently held that the BIA's mere failure to discuss all the evidence in its decision is not enough to warrant remand. *See Ramirez v. Garland*, 857 F. App'x 198, 199 (5th Cir. 2021) (per curiam); *Funes-Bonilla v. Holder*, 521 F. App'x 337, 338 (5th Cir. 2013) (per curiam) ("[A]lthough the BIA did not discuss all of the evidence of record, we are satisfied that it meaningfully considered [the petitioner's] evidence."); *Haile v. Holder*, 496 F. App'x 459, 460 (5th Cir. 2012) (per curiam) (same).[3]

By any measure, L. N. received "meaningful consideration" of her claims by the IJ and the BIA. She entered the United States and applied for asylum six years ago. Since then, the IJ has denied her claims for relief in not one but two detailed orders. To formulate its conclusion, the IJ considered all the evidence in the record, including the testimony of L. N. and Dr. Schubert and the country conditions evidence. For its part, the BIA remanded to the IJ to take a closer look at Dr. Schubert's testimony and the

---

[3] Citations to unpublished, non-precedential decisions in this context demonstrate that our cases are both consistent and that the proposition of law in question is settled.

country conditions evidence. The BIA then conducted an independent review and concluded that the evidence in the record supports the IJ's conclusions.

At a minimum, the BIA afforded L. N.'s claims the amount of consideration the law requires. Thus, remand is unnecessary.

2.

Apart from the paucity of support for remand based on the BIA's consideration and discussion of the evidence, it is settled that we need not remand if it would be futile to do so. *Jaco v. Garland*, 24 F.4th 395, 406 (5th Cir. 2021) (citing cases). "[E]ven if the Board erred at some point in its analysis, we can still uphold its ultimate decision if there is no realistic possibility that the Board's conclusion would have been different absent the error." *Nguhlefeh Njilefac v. Garland*, 992 F.3d 362, 365 (5th Cir. 2021) (internal quotation omitted). And "[i]t is the petitioner's burden to demonstrate that the evidence *compels* a contrary conclusion." *Argueta-Hernandez v. Garland*, 87 F.4th 698, 707 (5th Cir. 2023) (emphasis added).

In an attempt to satisfy her burden, L. N. points to testimony that, in her view, undermines the BIA's conclusion concerning state-sponsored persecution.[4] But even if this evidence contradicts the BIA's conclusion, there is also evidence in the record that *supports* it. Showing equipoise is not

---

[4] L. N. primarily relies on: (1) her testimony, in which she stated she believes the Angolan government is responsible for the murders of her family members; (2) Dr. Schubert's testimony, in which he stated "we can assume that [L. N.'s] perpetrators and persecutors are indeed linked to the [Angolan] security forces"; (3) the fact that the trial of those who murdered her family members was not open to the public; (4) country conditions reports, which note that in Angola "the secret court systems are applicable only in cases of the police and Armed Forces . . . ."; and (5) the fact that the Angolan police failed to adequately address her concerns when she reported incidents of harm.

sufficient to *compel* a finding that the Petitioner was persecuted by the Angolan government.

First, L. N. contends that those responsible for murdering her family in 1998 are connected to those who are responsible for the three incidents of harm she experienced. But L. N. never identified who committed the murders. When asked, "What, if anything, do you know about the individuals who carried out the assassination [of your family members]?", L. N. replied, "I know *nothing* about the people who killed, who murdered my family. I *only know* it was two individuals." (Emphases added). In light of this testimony, it cannot be said that the BIA erred in declining to conclude that the Angolan government is to blame for murdering her family and persecuting her.

Moreover, L. N. acknowledged that the Angolan government punished those responsible for the murders of her family members, and the perpetrators received eighteen-year prison sentences. From that evidence, the BIA could have reasonably concluded that the Angolan government was not involved in the murders of her family because the government would not impose punishment for crimes that the government itself committed or condoned.

The BIA's conclusion, to be sure, is not the only possible conclusion on this record. The Petitioner's evidence is that the government conducted trials in secrecy for crimes involving police or Armed Forces members, which may imply government involvement. On the other hand, factions in a government are not monolithic, and the secret trial could have indicated a rift between official factions. The only connection between the government and the murderers is by inference from the facts that the trial was conducted in secret and the Petitioner was not informed of the murderers' names. The

BIA was not *compelled* to accept this inference even if it credited the Petitioner's testimony and Dr. Schubert's expert "assumption."

Further, L. N. testified that the Angolan government responded when she reported harm. When shots were fired at her home in 2008, the police showed up, inspected the bullet holes, and encouraged her to remain silent *for her safety*. That caution is ambiguous: it can be taken as an implicit threat or as a means of protecting the witness during an investigation. The government's willingness to respond to L. N.'s reports of harm supports the BIA's conclusion that that the government was not involved in causing that harm. *See Jaco*, 24 F.4th at 406–07 (denying petition for review where "the record reflect[ed] that the [Honduran] government was responsive to [petitioner's] fears when apprised of them"); *see also Gomez-Medina v. Barr*, 975 F.3d 27, 32 (1st Cir. 2020) ("[T]he most telling datum is [whether] . . . the local authorities responded immediately to each incident." (alterations in original) (citation and quotations omitted)).

It is also undisputed that L. N. lived in Angola from 2003 until 2005 without experiencing any incidents of harm and experienced only one incident between 2007 and 2015. The long periods of time during which L. N. lived in Angola and did not experience harm buttress the BIA's conclusion that she is not entitled to the relief she seeks. *See Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 446 (5th Cir. 2001) (per curiam); (affirming the Board's decision where the petitioner lived in his country of origin for two years without harm); *see also Perez-Leiva v. Garland*, No. 21-60935, 2022 WL 4990391, at *1 (5th Cir. Oct. 3, 2022) (per curiam) (denying petition for review where Honduran petitioner's daughter "had not been physically harmed in the five-years since she relocated" within Honduras).

Where, as here, the evidence concerning state-sponsored persecution merely cuts both ways, we cannot reverse the BIA's decision. *See Greenspan*

*v. Shalala*, 38 F.3d 232, 240 (5th Cir. 1994) (affirming ALJ's determination under the substantial evidence standard where the evidence "cuts both ways"); *see also Tabora Gutierrez v. Garland*, 12 F.4th 496, 502 (5th Cir. 2021) ("[W]e may not reverse the BIA's factual determinations unless we find not only that the evidence supports a contrary conclusion, but that the evidence *compels* it." (emphasis in original) (citation and quotations omitted)).

**B**

L. N. next argues that when properly viewed, substantial evidence does not support the BIA's conclusion that the Angolan government was willing and able to protect her. For this additional reason, L. N. advocates reversal of the BIA's decision.

But the evidence discussed in part III.A.2. of this opinion and other evidence supports the BIA's conclusion. For instance, the fact the government incarcerated the murderers of L. N.'s family members suggests the Angolan government sought to protect her from suffering a similar fate by putting their killers behind bars.

Moreover, the police responded when shots were fired at L. N.'s home in 2008. That the police showed up at the scene of the incident and investigated suggests the government was and is willing to protect her.[5] *See Jaco*, 24 F.4th at 406–07 ; *see also Gomez-Medina*, 975 F.3d at 32.[6]

---

[5] The dissent views the evidence concerning the police response differently than the BIA did. *Post*, at 25–26. But the mere fact a different conclusion might be drawn from this evidence does not require reversal. *See La. Dep't of Lab. v. U.S. Dep't of Lab.*, 108 F.3d 614, 617 (5th Cir. 1997) ("[T]he mere fact that a different conclusion might be drawn from the evidence does not necessarily preclude a determination that an administrative decision was supported by substantial evidence.").

[6] The dissent chides the quality of the police investigation. *Post*, at 24–25. But the fact that the police did not do more and ultimately determine who fired the shots is of no moment. *See Mejia-Alvarenga v. Garland*, 95 F.4th 319, 325 (5th Cir. 2024) ("A government is not

No. 23-60203

There is also evidence that the government can protect L. N. if she is still at risk of harm by private actors. As the IJ observed, "[a]ccording to the Country Report [for Angola], '[t]he security forces generally were effective . . . at maintaining stability,' and the 'police presence in neighborhoods and on streets [served to] enhanc[e] general safety and security.'"

In sum, substantial evidence supports the BIA's conclusions that the Angolan government was able and willing to protect L. N..

## C

L. N. argues that the BIA committed legal error in failing to "determine the Angolan authorities' past ability and willingness to protect [her] as an initial matter and separate from the predictive finding of how they would act in the future." In other words, she argues that the BIA was required to bifurcate analysis of past and future inability or unwillingness to protect L. N.. Accordingly, she requests remand.

The Government responds that, "[b]ecause Petitioner cannot establish 'persecution' for immigration purposes without establishing the government unwilling or unable requirement, a regulatory presumption of future harm would not apply regardless of the severity of the harm Petitioner alleges." Thus, it was not error for the BIA to decline to reach the issue of whether the mistreatment rose to the level of harm required for persecution.

---

unable or unwilling to protect against private violence merely because it has difficulty solving crimes or anticipating future acts of violence." (citation and quotations omitted)). Instead, the police response to this incident appears to have been par for the course. As L. N. acknowledged, "[g]enerally, unless someone has died, the Angolan police will not investigate." Because the 2008 incident did not involve a casualty, the BIA could have reasonably concluded that the police response was normal under the circumstances and that they did not treat her differently because of her and her family's opposition to corruption.

The BIA specifically stated that "respondent did not establish past persecution" because "she did not meet her burden to show that the Angolan authorities were or would be unable or unwilling to protect her from the private actors she fears." To prevail on a claim of past persecution, a noncitizen must establish that she suffered persecution at the hands of the government or forces that a government is unable or unwilling to control. *Tesfamichael v. Gonzales*, 469 F.3d 109, 113 (5th Cir. 2006). Because findings of that nature are necessary to show past persecution, the BIA did not err in relying on this analysis. We find no precedential support for a bifurcated approach. We reject this argument.

### D

Finally, we turn to L. N.'s CAT claims. L. N. argues that the BIA erred in finding she provided insufficient evidence demonstrating a risk of torture because it ignored government involvement and failed to consider evidence supporting a likelihood of torture. She requests remand for the agency to consider "all relevant evidence" in assessing her claim for CAT relief.

The Government points out that L. N.'s claim is based on speculation. "Substantial evidence supports the conclusion that [L. N.] did not show that, upon return to her native country, she would more likely than not be tortured by or with the acquiescence of the Angolan government." It argues that the Petitioner's experiences do not rise to the level of torture, and that her assertion she would be tortured by state actors was speculative.

We review the denial of CAT relief for substantial evidence. *Zhang v. Gonzales*, 432 F.3d 339, 344 (5th Cir. 2018). One who seeks CAT relief must show that she is more likely than not to be tortured with official acquiescence if repatriated. *Morales v. Sessions*, 860 F.3d 812, 818 (5th Cir. 2017).

"Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." *Id.*

The BIA rejected this claim on the grounds that she had shown neither past torture nor a likelihood of future torture. L. N. points to no "particularized" evidence that would "demonstrate an individualized risk of torture to her" but relies on evidence showing that she suffered nightmares and physiological symptoms due to the incidents underlying her claims and that violence is prevalent in Angola. *See id.* Substantial evidence supports the BIA's decisions regarding torture in Angola.

## IV

For the foregoing reasons, we DENY the petition for review.

No. 23-60203

Dᴀɴᴀ M. Dᴏᴜɢʟᴀs, *Circuit Judge*, concurring in part and dissenting in part:

Although I agree with the majority that the Board did not err in failing to bifurcate its analysis of past and future inability to protect L. N. and that the evidence does not compel reversal on her CAT claim, I part ways on the remainder of the opinion. I agree with L. N. that the BIA and IJ legally erred by failing to explain its dismissal and discounting of credible evidence of state-sponsored persecution. Further, I believe that the record evidence compels the determination that the Angolan government was unwilling or unable to protect L. N. and remains unwilling to do so. Because I would grant the petition for review and remand for further proceedings on these points, I respectfully dissent.

**I**

Because the majority does not provide all the context underlying L. N.'s claims, we begin with a recitation of the full background. L. N. was the daughter of an Angolan police commissioner. She attended meetings with him, and he introduced her as his daughter. In 1998, her father, mother, and brother were murdered. They were shot in the head, and her father's tongue was cut out. L. N. testified that in Angola, cutting one's tongue out means the person "spoke too much and reveal[ed] things" and that this act is meant to serve as a warning to others that "if they speak, they will experience the same fate."

When her family was killed, L. N. was in Cuba. Her father sent her there to protect her because he was receiving threats due to his work. She learned of her family's murder through the Angolan Consulate in Cuba, and she testified that her family was killed because her father denounced corruption. Specifically, her father denounced a group selling weapons. According to L. N., this group was supported by the police and some

15

members of the Angolan government.  The government refused to disclose any information on her family's murderers, and instead only disclosed that two unnamed men carried out the attack.  "[T]here was no public trial, and the government refused to reveal their names."  When she sought additional information, investigators informed her that "they could not tell her [anything] to protect her."  The two men were imprisoned from 1998 to 2016.

L. N.'s only surviving sister, who was in Cuba with her at the time of their family's murder, returned to Angola in 1999 to investigate the killings.  Her sister, however, subsequently "disappeared" and L. N. has not spoken to her since 1999.  The same year, L. N. left Cuba for Ecuador, where she was granted temporary refugee status and remained until 2003.  In 2003, she returned to Angola and remained there until 2005, when she returned to Ecuador.  From 2007 to 2015, she lived in Angola, briefly returning to Ecuador from 2015 to 2016 before returning to Angola through 2017.

L. N. credibly testified to three threats on her life.  The first occurred in Angola between 2008 and 2009.  In this instance, shots were fired at the house where she was staying.  L. N. believes that she was targeted because she is the only remaining member of her family.  L. N. reported the incident to the police, who inspected the bullet holes, suggested that she remain silent, and asked her if she was afraid of disappearing.

She received the second threat on her life in Quito, Ecuador in 2016 — the same year her family's unidentified murderers were released from prison.  As she was leaving her home, two people dressed in traditional Angolan clothing grabbed her by the hair and put a gun under her nose.  At the same moment, a bus stopped, and as people were exiting the bus, L. N. was able to flee her attackers.  She reported the incident to the Ecuadorian police, but

despite a month-long investigation, no arrests were made. She then returned to Angola, first to Luanda and then to Lubango.

The third incident occurred in September 2017. As L. N. was approaching her home, a neighbor informed her that her house had been set on fire. The neighbor added that there were flyers outside the home that read, "son of a fish is also a fish, and therefore knows how to swim." L. N. interpreted this as a threat related to the murder of her family.

After this incident, L. N. sought shelter at a monastery with nuns. During her time there, the nuns punished her for being sexually impure, claiming that all the tragedies she faced were her own fault, and burning her between the legs. She was taken to the hospital because she developed blisters and a fever from the burns, and then fled to the United States.

The Department of Homeland Security ("DHS") issued a notice to appear alleging that L. N. was removable because she applied for admission without valid entry documents. She conceded the factual allegations against her, and the IJ found her removable. She applied for asylum, withholding of removal, and CAT relief. The IJ denied relief following a hearing at which L. N. testified. The BIA remanded for further proceedings, concluding that the IJ failed to make findings concerning the opinion of her expert, country conditions, the Angolan government's willingness and ability to protect her, and internal relocation. On remand, the IJ then addressed these aspects of her claim but again denied relief, and the BIA subsequently dismissed the appeal.

## II

I am persuaded by two of L. N.'s arguments and believe that the IJ's and BIA's consideration of her claims was unsatisfactory. First, the Board and IJ committed legal error by failing to explain its dismissal and discounting of credible evidence of state-sponsored persecution. Importantly, we "may

reverse a decision that was decided on the basis of an erroneous application of the law." *Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 384 (quoting *Mikhael v. INS*, 115 F.3d 299, 305 (5th Cir. 1997)). Next, even reviewing for substantial evidence, the record compels a conclusion that the Angolan government was and remains unwilling or unable to protect L. N.. Accordingly, remand to the BIA is warranted.

## A

L. N. argues that the Board erred in finding insufficient evidence to show that her persecution was state sponsored. She claims that the evidence—including L. N.'s own testimony, her expert's testimony, and country condition reports—supports a finding that the Angolan government perpetrated her persecution. She faults the IJ and BIA for failing to explain its dismissal and discounting of credible evidence of state-sponsored persecution where nothing exists in the record to contradict it. She seeks remand to properly assign the burden of proof regarding internal relocation. In response, the Government counters that L. N. has not demonstrated that the harm she experienced was perpetrated by the Angolan government because there is no compelling record evidence linking the perpetrators to the Angolan government.

Notably, the IJ found L. N. to be credible. As we have held, "[t]hat the IJ did not doubt [L. N.'s] testimony is significant, because we must accept as true all the facts to which [L. N.] testified." *Zhao v. Gonzales*, 404 F.3d 295, 306 (5th Cir. 2005). Here, L. N. testified regarding her belief that the men responsible for her family members' murders were associated with the Angolan government. Her testimony was corroborated by evidence in the record, including both an expert opinion and country conditions.

The majority attempts to downplay the significance of the IJ's credibility finding by indicating that an individual can be denied asylum

despite a credibility finding. This may be true, but it does not undermine the fact that our precedent requires us to accept all facts that L. N. testified to as true. *Zhao*, 404 F.3d at 306. Moreover, where an applicant for asylum is found credible, regulations state that this alone may be sufficient to sustain the burden of proof (without the requirement of corroboration by any additional evidence). 8 C.F.R. § 1208.13(a). As noted *infra*, L. N. also provided corroborating evidence.

For example, she presented uncontroverted expert testimony to establish the involvement of the Angolan government. Dr. Schubert, her expert, concluded that L. N.'s narrative was consistent with country conditions and the likelihood of government involvement because of the internal and private nature of the prosecution of the murderers of her family. Country condition reports likewise support a finding of state involvement. The U.S. Department of State confirms that "[b]oth the national police and the [Angolan Armed Forces] have internal court systems that generally remained closed to outside scrutiny."

We review the BIA's decision "'procedurally' to ensure that the complain[ant] has received full and fair consideration of all circumstances that give rise to his or her claims." *Cabrera v. Sessions*, 890 F.3d 153, 162 (5th Cir. 2018) (quoting *Abdel-Masieh v. INS*, 73 F.3d 579, 585 (5th Cir. 1996)). The BIA's decision "must reflect a meaningful consideration of all the relevant evidence supporting an asylum seeker's claims." *Id.* While "[w]e do not require the BIA to specifically address every piece of evidence put before it," it is legal error for the agency to "fail[] to address...key evidence." *Id.* Thus, the immigration court must explain its dismissal or discounting of credible evidence, particularly when it contradicts an expert opinion. *Matter of M-A-M-Z-*, 28 I&N Dec. 173, 177-78 (BIA 2020); *see also Castillo v. Barr*, 980 F.3d 1278, 1283 (9th Cir. 2020) ("If the Board rejects expert testimony, it must state in the record why the testimony was

insufficient . . .”). Contrary to the majority, it is insufficient to accept a statement by the BIA or IJ that it has considered and weighed all the evidence, when our own reading of those opinions makes clear that the agency has failed to address key evidence and failed to explain its dismissal and discounting of credible evidence. This legal error cannot be surmounted by pointing to substantial evidence that may support the BIA finding.

To support its holding that L. N. failed to prove the involvement of government actors, the BIA pointed only to the fact that the two men were arrested and prosecuted in connection with her family's murders in 1998 and that police responded in 2008 to shots fired at her home. However, it did not explain *how* the fact that two men were arrested and prosecuted undermine L. N.'s or Dr. Schubert's credible testimony that state actors were involved in the murders and attacks. Nowhere did the IJ or BIA address how the shrouded nature of the trial supported the inference that government actors were involved. The BIA also failed to explain how police responding to gunfire in 2008 counters or diminishes the facts presented in the record evidence to support government involvement. The Board errs when it ignores credible evidence of state-sponsored persecution where nothing exists in the record to contradict it. *M-A-M-Z-*, 28 I&N Dec. at 177-78. The record evidence identified by the Board does not contradict the likelihood of government involvement.

Here, the BIA stated that “the respondent did not provide evidence connecting the individuals she fears with the Angolan government or evidence that they were acting on behalf of the government.” It noted Dr. Schubert's affidavit but dismissed it as an “assum[ption], based on the respondent's testimony.” The IJ also stated that although L. N. “credibly testified that her father was a police commissioner, she has not substantiated her claim that government actors carried out the murder of her family.” Instead, the IJ claimed that L. N. “simply reference[d] a criminal group that

she believes is involved with the police and Dr. Schubert's 'assum[ption]' that her perpetrators are linked to the government." "Based on this alone," the IJ claimed it could not conclude that her persecutor is the Angolan government.

But this was not the only evidence or *credible* testimony provided by L. N.. She points to evidence that no public trial was held, that the Angolan government refused to name the individuals tried in connection with the murder, and that Dr. Schubert's expert opinion is based on "his independent knowledge of Angola, the consistency of Ms. L. N.'s narrative with country conditions, and the key fact of secrecy around the trial and identity of the men sentenced." Additionally, Dr. Schubert's expert opinion testimony provides an example of the Angolan government's handling of another murder by agents of the state security service—in the same secretive manner at issue here—to explain the basis for his opinion. Indeed, it was not only L. N.'s testimony that enforced his expert opinion, but the additional evidence of the Angolan government's refusal to hold a public trial or share the names of the men convicted. As noted, this is consistent with country conditions reports of internal court systems for the Angola Armed Forces and national police, which are closed to the public.

The majority draws its own conclusions to affirm the Board based on rationale that the BIA never stated. For example, it states that the "BIA could have reasonably concluded that the Angolan government was not involved in the murders of her family because the government would not impose punishment for crimes that the government itself committed or condoned" and that "the secret trial could have indicated a rift between official factions." But "[w]e may only affirm the BIA based on its stated rationale." *Argueta-Hernandez v. Garland*, 87 F.4th 698, 707 (5th Cir. 2023) (emphasis added). This type of post hoc rationalizing is impermissible on our

appellate review of the BIA's decision and cannot support the majority's affirmance.

I find further support for legal error in the cases cited by the Government. For example, in *Matter of D-R-*, the BIA stated that "[a]n Immigration Judge is not required to accept a respondent's assertions, even if plausible, where there are other permissible views of the evidence based on the record." 25 I&N Dec. 445, 455 (BIA 2011). But it is unclear what an alternative permissible view of the evidence might be in this case. The only evidence the Government points to is that the Angolan government sentenced the two men who murdered L. N.'s family to prison time. But this fact does not undermine the plausible, and frankly probable, inference that the persecutors were government actors based on the evidence outlined above. Accordingly, "[a]lthough the original record does not contain direct evidence that" the Angolan government were L. N.'s persecutors, "that inference is unavoidable in light of [L. N.'s] credited, uncontroverted testimony," and the other record evidence before us. *Zhao*, 404 F.3d at 309.

This error is compounded by the fact that the BIA and IJ made statements expressly denying the existence of crucial record evidence. We have remanded where the BIA makes a statement that "appears to deny the existence of evidence that clearly exists in the record." *Ndifon v. Garland*, 49 F.4th 986, 990 (5th Cir. 2022) (remanding where BIA stated that petitioner "points to *no other objective evidence* to support his claim" despite the existence of evidence regarding country conditions) (emphases added). In *Ndifon*, we further held that the BIA's error was not cured even though the IJ expressly considered the evidence it ignored. *Id.* at 990-91.

Here, neither the BIA nor the IJ engaged with the additional evidence presented by L. N.. Instead, the BIA stated that she "did not provide evidence connecting the individuals she fears with the Angolan government

or evidence that they were acting on behalf of the government," and the IJ stated that L. N. "has not substantiated her claim that government actors carried out the murder of her family." These statements make clear that L. N. "did not receive 'meaningful consideration of the relevant substantial evidence supporting'" her claims. *Ndifon*, 49 F.4th at 991 (quoting *Abdel-Masieh*, 73 F.3d at 585). As the ample evidence put forth by L. N. demonstrates, these statements "deny the existence of evidence that clearly exists in the record," and require remand. *Id.* at 990.

## B

L. N. next argues that when properly viewed, no reasonable factfinder would conclude that the evidence shows that the Angolan state was willing and able to protect her. Instead, the evidence suggests that the authorities demonstrated that they condoned her persecution by refusing to act and by pressuring her to stop seeking protection at all. Because substantial evidence does not support the BIA's conclusion, she requests remand to allow the agency to fully address arguments supporting past persecution.[1] The Government counters that substantial evidence supports the BIA's determination that L. N. failed to meet her burden, pointing to the Angolan government's arrest and sentence of the individuals charged with murder of her family and that the police responded to the incident where shots were fired at her home.

"When private actors are concerned, the applicant must show that the government condoned the private violence 'or at least demonstrated a complete helplessness to protect [the applicant]." *Bertrand*, 36 F.4th at 631-32. In this case, the police not only showed inaction, but they actively

---

[1] Notably, the BIA did not consider evidence of past persecution because it determined that L. N. did not carry her burden to show that she was persecuted by Angolan authorities.

discouraged L. N. from seeking protection. The fact that they prosecuted the two men who murdered her entire family does not detract from the evidence of their unwillingness to help at every juncture since then.

The cases the Government relies upon to show that the Angolan government "responded to an applicant's requests and evinced an interest and willingness to help" are easily distinguishable from the instant matter. For example, in *Saldana v. Lynch*, the government was found to be willing and able to protect where police acted on the complaint and continued to investigate the matter. 820 F.3d 970, 976-77 (8th Cir. 2016). This differs from the police response here, where they did not investigate the matter further and discouraged L. N. from reporting to them. Moreover, in *Nahrvani v. Gonzales*, the police took reports and made reasonable efforts to investigate and were therefore not unwilling or unable to protect the applicant even though they could not solve the crime. 399 F.3d 1148, 1154 (9th Cir. 2005). Again, this is different than here, where the police made *no* efforts to investigate. Furthermore, in *Ritonga v. Holder*, the police "investigated the assault and apprehended the criminals." 633 F.3d 971, 977-78 (10th Cir. 2011). Nothing of the sort happened in response to L. N.'s calls for help. Confusingly, the majority accepts the utter lack of response as sufficient, despite the great weight of precedent against this conclusion, including that put forth by the Government.

Although the Government, like the BIA, points to the Angolan government's current efforts to prevent corruption in a global sense, the Government itself admits that the "Angolan government continues to encounter difficulties in their efforts to control and curb general criminality, while still combatting corruption," as supported by country report evidence.

Moreover, the BIA has specifically recognized instances where state authorities were unable or unwilling to control private persecutors in similar

scenarios. For example, in *Matter of O-Z- & I-Z-*, the BIA found that police "[taking] no action beyond writing a report" demonstrated that the Ukrainian government was unable or unwilling to control the applicant's persecutors. 22 I&N Dec. 23, 26 (BIA 1998). We have also stated that "the failure to do anything beyond writing reports is stronger evidence of an unwillingness to help." *Bertrand*, 36 F.4th at 633, n.6. Here, it is unclear if the police ever even wrote a report.

But importantly, in this case, there is a clear statement by authorities that they were unwilling to act to protect L. N.. The authorities specifically told L. N. to stop seeking protection. After her house was shot up, the police instructed her to be quiet: "You know, people disappear here every day. You have no one. You should be quiet." They suggested she might be "disappeared" but offered no protection. When she pushed for action, they treated her in a derogatory manner and refused to act. After her home was burned down in 2017, the police told her to "find a husband" and again refused to act. We have held that the BIA improperly concluded that a petitioner failed to establish government acquiescence because the government acknowledged that the petitioner was no longer safe in his country, asked that he sign a liability waiver, and placed him in a taxi to another county. *Argueta-Hernandez*, 87 F.4th at 714. Similarly, here, L. N. provided sufficient evidence to compel the conclusion that the Angolan government is unwilling and unable to protect her and was unwilling to do so in each instance that she contacted them. Furthermore, current efforts to curb corruption in Angola do not undermine such a conclusion. Like the legal errors outlined above, the lack of substantial evidence supporting the BIA's conclusion warrants remand.

No. 23-60203

### III

The majority errs in providing post hoc rationalizations for the BIA and compounds the BIA's errors by downplaying the severity of the harms L. N. has suffered.  Each applicant for asylum relief deserves to have their claims heard and any subsequent denial of a petition adequately explained. "Although we owe deference to the BIA, that deference is not blind." *Argueta-Hernandez*, 87 F.4th at 703.  From the record, it is clear that the BIA legally erred in considering the evidence before it and that substantial evidence supports the conclusion that the Angolan government was unable and unwilling to protect L. N..  The BIA's poorly reasoned decision, and the majority's affirmance, leaves L. N. in peril.  Accordingly, I dissent.